The State of Ohio, Appellee, *v.* Good, Appellant.*

(No. 6001—Decided June 30, 1959.)

*Mr. Earl W. Allison,* prosecuting attorney, and *Mr. Albert G. Giles,* for appellee.

*Messrs. Tyack & Gertner,* for appellant.

*Per Curiam.* Ronald L. Good, defendant, appellant herein, was convicted of four counts of violating Section 3719.20 of the Revised Code (126 Ohio Laws, 178, 188). After the overruling of a motion for a new trial, he was sentenced and has appealed to this court.

The court being equally divided (one judge not participating), the case is assigned for reargument before a three-judge court.

Bryant, P. J. Ronald L. Good, defendant, appellant herein, has appealed to this court from his conviction and sentence in the court below. There he was charged in eight counts and convicted on four counts of violating Section 3719.20 (A) and (B) of the Revised Code (126 Ohio Laws, 178, 188) forbidding, respectively, illegal possession for sale and illegal sale of narcotics.

Counts one and two for illegal possession and illegal sale allegedly occurring February 6, 1958, were withdrawn by the state. Counts three and four alleging illegal possession for sale and illegal sale on February 8, 1958, and counts five and six alleging, respectively, illegal possession and illegal sale on February 14, 1958, were submitted to the jury and resulted in a verdict of guilty on each count. Counts seven and eight for illegal possession and illegal sale, respectively, allegedly occur-

---

*For opinions of visiting judges sitting by designation in the Tenth Appellate District, on reargument, see *post* 415.

ring on February 22, 1958, were submitted to the jury and resulted in a not guilty verdict.

The first six counts of the indictment related to the alleged possession or sale of marijuana, while in counts seven and eight the narcotic was alleged to be heroin. Of course, our primary concern here is with the four counts upon which Good was found guilty. It should be noted that all sales were alleged to have been made to Lloyd Williams, Jr., a police informer.

The appeal in this case presents a special difficulty at the outset for the reason that it is an appeal "on questions of law and fact." Appeals in criminal cases are limited to appeals on questions of law. Section 2501.02 of the Revised Code enumerates ten classes of cases in which appeals on questions of law and fact are authorized and then contains this language:

"In all cases not falling within the classes designated above the Court of Appeals shall have jurisdiction to proceed as in an appeal on questions of law only."

The appeal in this case would properly have been subject to a motion to reduce, but no such motion has been filed nor has the issue been raised on behalf of the state of Ohio, plaintiff, appellee herein. Furthermore, counsel for Good has proceeded as though this were an appeal on questions of law and has filed a brief containing ten assignments of error, as is proper in a law appeal. We shall therefore treat this as having been properly reduced and shall consider the errors assigned.

The first and sixth assignments of error will be considered together. In the first assignment, it is claimed the defendant was deprived of a fair trial because the jurors in the case had served, immediately prior to Good's trial, in another case or cases involving narcotic law violation in which the same witnesses testified. The first assignment of error also complains that the trial judge refused "to step down." The sixth assignment of error complains of the refusal of the trial court to sustain a challenge for cause to the panel.

The brief of defendant contains statements of a number of facts which are completely unsupported by the record. Whether a particular juror in the case on appeal sat in one or several other cases of such similarity as to disqualify the juror is a question of fact. The record is completely silent. About all we

get from the record is that a challenge for cause was made by counsel for Good, after which the trial court, making reference to one other case, interrogated the jurors whether they did feel "embarrassed" to sit in the trial of Good. None of the jurors said they would be embarrassed, and the court ruled that "cause" had not been shown; and we are unable to find where either objection or exception was taken to this ruling.

We cannot consider, weigh or decide matters not exemplified in the record. The record is likewise completely silent on any challenge asking the trial court "to step down." So far as we have been able to learn the trial court did not display any unfairness toward Good. For the reasons above set forth, the first and sixth assignments of error should be overruled.

The second assignment of error relates to the admission of "certain exhibits." It is extremely difficult to follow the objections on behalf of Good, for the reason that no exhibit is mentioned by number. As to the objection to the writings upon the several envelopes introduced into evidence, we note that the trial court specifically cautioned the jury not to consider such written words as evidence or proof of any element of the crime charged. The court described the words written on the envelopes as "certain writing on some of these exhibits which pertain to the elements of these charges." The court then continued with these words:

"Those writings should not be considered in themselves as evidence or as proof of the establishment of the elements that I have referred to that are necessary for you to find to render your verdict in this case."

Thus the jury was directed to give no probative value to the writings complained of and there does not appear any reason to believe that the jury disregarded these instructions.

Objection also is made to the admission of certain photographs, state's exhibits No. 5 and No. 8, inclusive. These are photographs of the back of an automobile with the trunk lid raised and showing a man lying inside. These apparently have to do with events occurring on March 8, 1958, or March 6, 1958. If their admission constituted error, it would appear to be harmless error. This is for the reason that Good admitted selling Lloyd Williams, Jr., the state's informer, Dormin sleeping

pills on two occasions the same day under the representation that they were heroin. This we assume was on March 8, 1958. The second assignment of error is not well taken and must be overruled.

The third assignment of error should be overruled because it is vague and uncertain, merely complaining of the admission of "certain evidence and testimony" claimed to be prejudicial. The bill of exceptions in this case is nearly four hundred pages in length and this assignment of error is too vague to indicate the items objected to, as neither pages nor quotations of material objected to are set forth.

The remaining assignments of error, except nine, relate directly or indirectly to the defense of entrapment and will be considered together. Assignment four objects to the failure of the court to give special charges on entrapment. Assignment five complains that the trial court failed to charge on entrapment in its general charge. Assignment seven objects to overruling a motion to dismiss at the end of the state's case, and assignment eight objects to the overruling of a motion to dismiss at the end of all the evidence, both motions to dismiss being based upon alleged entrapment of Good, or that Good was agent merely for Williams.

Was the defense of entrapment justified by the record in this case? Should the two special charges on entrapment have been given, or, if not, should the court have charged upon entrapment in its general charge? Should the motions to dismiss upon the ground of entrapment, one at the end of the state's case and the other at the end of all the evidence, have been sustained? The trial court apparently felt that entrapment was simply not in the case and held against the contentions of Good upon each of these questions.

Of course, there was no formal plea of entrapment in this case. The defendant entered a plea of not guilty. The plea of entrapment is a little like a confession and avoidance. It inferentially admits that the acts were done, which otherwise would constitute the crime, but contends that the state or government induced, incited or persuaded the defendant to do the things he did and therefore no conviction may be had.

Logically, it would seem to follow that if a defendant claims

he has been entrapped into the commission of a crime, he is, as indicated above, confessing and seeking to avoid the consequences.

If there was entrapment in the case of Ronald L. Good, it must appear in the record from the testimony of witnesses, either for the state or the defendant, or both. It apparently may be established to a sufficient degree to require submission to the jury and a special charge thereon merely by accepting statements of the defendant at their reasonable face value.

The question therefore recurs, was there entrapment in this case? Defendant places strong reliance upon the case of *Sherman* v. *United States*, 356 U. S., 369, 2 L. Ed. (2d), 848, 78 S. Ct., 819, a narcotics case, decided by the United States Supreme Court on May 19, 1958. In the *Sherman case, supra,* the court found that entrapment was established by the testimony of the government's witnesses, and the court adhered to the doctrines announced by it in the case of *Sorrells* v. *United States*, 287 U. S., 435, 77 L. Ed., 413, 53 S. Ct., 210, 86 A. L. R., 249, a prohibition law case.

In the *Sorrells case, supra,* it was expressly held that the defense of entrapment involves a determination of the intent of the framers of the statute alleged to have been violated.

It seems quite clear that examination of the facts is necessary to determine when entrapment arises, or does not arise, in a particular case.

In the *Sherman case, supra,* the court in the opinion, at page 372, said:

"* * * Criminal activity is such that stealth and strategy are necessary weapons in the arsenal of the police officer. * * *"

In the *Sorrells case, supra,* the court in the opinion, at page 441, said:

"It is well settled that the fact that officers or employees of the government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises."

What, then, were the facts in these two cases before the United States Supreme Court?

In the *Sorrells case, supra,* a prohibition agent named

Martin went to the home of Sorrells accompanied by three residents of the county who knew Sorrells well. Defense witnesses testified that the agent and his companions were at Sorrells' home for an hour or an hour and a half, that the agent asked Sorrells on quite a number of occasions to get him some liquor and that Sorrells repeatedly refused. The fact that the agent and Sorrells had served together during World War I was finally injected to arouse Sorrells' sympathy, after which Sorrells gave in and left. Upon returning sometime later with the whiskey, he was arrested. It was shown that Sorrells had worked continuously on his job without missing a pay day from March 1924 until July 1930. The court therefore concluded that the law violation *"was instigated by the prohibition agent, that it was the creature of his purpose, that defendant had no previous disposition to commit it but was an industrious, law-abiding citizen, and that the agent lured defendant, otherwise innocent, to its commission by repeated and persistent solicitation in which he succeeded by taking advantage of the sentiment aroused by reminiscences of their experiences as companions in arms in the World War."* (*Sorrells* v. *United States, supra,* 441.) (Emphasis added.)

In the *Sherman case, supra,* the court found that Kalchinian, a government informer, met Sherman at a doctor's office where Sherman had gone for treatment to cure narcotic addiction. This was followed by several accidental meetings either at the doctor's office or at the pharmacy where both went for prescriptions. Finally, the informer asked Sherman to supply him with a source for narcotics because the informer allegedly was not responding to treatment. In the *Sherman case, supra,* at page 371, it is said:

"* * * He [informer] asked petitioner [Sherman] to supply him with a source because he was not responding to treatment. *From the first, petitioner tried to avoid the issue. Not until after a number of repetitions of the request, predicated on Kalchinian's presumed suffering, did petitioner finally acquiesce*" (Emphasis added.)

In the same opinion at page 373, there appears the following:

"* * * *One request was not enough, for Kalchinian tells us*

*that additional ones were necessary to overcome, first, peti-*
*tioner's refusal, then his evasiveness, and then his hesitancy in*
*order to achieve capitulation. Kalchinian not only procured a*
*source of narcotics but apparently also induced petitioner to re-*
*turn to the habit."* (Emphasis added.)

In the case now before us, Lloyd Williams, Jr., was the in-
former and made the contact with the defendant. We must as-
sume that the conduct of the officer, or informer, the first time
narcotics were discussed, merits close scrutiny and likewise
that the statements and actions of the defendant are of highest
importance in determining whether entrapment has taken place.

In the case now before the court, Good, the defendant, and
Williams, the informer, are in substantial agreement as to what
took place between them at the meeting when narcotics were
first discussed. Williams apparently said that someone he had
paid to furnish marijuana had failed to do so. The two had
drinks which were ordered and paid for by Williams. This was
followed by an inquiry by Williams as to whether Good knew
where Williams could obtain marijuana, followed by a brief dis-
cussion, at the end of which Good accepted ten dollars, disap-
peared for a short time and returned, delivering a package to
Williams, which Good represented to be marijuana. The fol-
lowing is the account of this initial meeting at which narcotics
were discussed, as given by Williams, the informer:

"Q. Now, you say you knew him by name about a month
before you made these buys, as you call them. Can you tell us
when you, after that particular time, after you knew him by
name, when you first talked with him? A. It was on February
2nd, sir.

"Q. On February 2nd? A. Yes, sir.

"Q. And what was the occasion of that meeting? A. He
was supposed—he come up to me and asked me, or I asked him
did he have any marijuana to sell, and so he told me yes, to
come over to the Troc with him.

"Q. What is the 'Troc'? A. It is a club and kind of a hotel.
So, we went up on the second or either the third floor of the
Troc, and he told me to wait in the bathroom, and he went down
the hall and come back in about four or five minutes later, and
he gives me a little plastic or cellophane bag with some mari-

juana in it, and I gave him five dollars for it. So, I turned that over to Officer Ryan, and the lab report showed it to be boneset tea and some marijuana in it.''

What does the defendant have to say about this meeting? For one thing, I note that Good, either by accident or design, fixes the time approximately one month earlier than all the other witnesses in the case. It is my conclusion that the meeting when narcotics were first discussed took place during the first few days of February, but Good emphatically places the time as early in January. His testimony on this question is as follows:

''Q. O. K. Now, was there ever any time that you and Mr. Williams discussed the matter of narcotics? A. Yes, sir.

''Q. Tell the jury the circumstances under which it was first brought up? A. Well, I went in the Idle-A-While Bar at one time—

''Mr. Newsom: Could you fix the time, this particular time?

''Q. Well, roughly, when was that, Ronald? A. Well, I will say about—oh, about the first or second of January— around—I will say around 7:30 or 8:00 o'clock.

''Q. Was that January or was that February? A. January.

''Q. All right. Tell us what happened. A. Well, I went in the Idle-A-While Bar, and he asked me did I want to have a game of shuffleboard, and I said yes, and we played one game, and he asked me did I know a fellow by the name of—

''Q. Will you speak up so that these people can hear you. They can't hear you in the back row here. A. He asked me did I know a fellow by the name of Little Jackson, and I told him— I asked him who, and he said Little Jackson, and I said I knowed him—that I knowed him when I seen him, and he asked me did I want a drink.

''Q. I didn't hear that. He asked you what? A. He asked me did I want a drink, did I care for a drink, and I said yes. And we was standing at the bar, and he ordered a drink and paid for them, and then he told me that Jackson had took some money from him for some marijuana, and he was looking for him. And I told him I hadn't seen him. *He asked me did I*

*know where he could get some, and I told him that I know a fel-
low that might have some, and he asked me could he get a $5.00
bag, and I told him I didn't know, but I believe he could. And
so, he pulled out his money, and I says, 'You might as well get a
$10.00 bag.' And I handed him the $5.00 back, and he gave me
$10.00.* So, I told him to meet me at the Trocaveria downstairs.
And I left the Idle-A-While Bar and went to 17th and Mount
Vernon down to this drugstore, and attempted to purchase
some boneset tea, and they didn't have any. So then I left there
and I went to Mars, between 20th and Miami, and I asked the
lady for some boneset tea, and she sold me a bottle, and I left
there, and on the right side of the street, I started back there
towards the Idle-A-While, and I stopped in a cafe. [Emphasis
added.]

"Q. You stopped where? A. I stopped in a cafe, Rosie's
Cafe, I think the name of it is. And I went in the men's room,
and I took a hand paper towel and poured out the boneset tea
in it, and I wrapped it up and went back down to the Trocaveria
and met Williams, and I give it to him.

"Q. Did anything else happen that night? A. Well, other
than he took it and put it in his pocket and left.

"Q. Well, then when did you next see Williams? A. I saw
him the next day."

While there are some minor differences in the statements
of Williams and Good as to the meeting described above, they
are quite similar in most important respects. Apparently all
that Williams needed to do to make a deal with Good was to say
that he was a user of marijuana and had purchased some from
a fellow by the name of Little Jackson and then ask whether
Good could put him in touch with a source of supply. No where
was there the long continued persuasion, the repeated visits, the
appeals to sympathy or the other factors which sometimes lead
courts to say that the criminal plan originated in the mind of
the officer or the informer.

It was admitted by all concerned that boneset tea is not
a narcotic, and Good apparently is under the impression that
he committed no offense when he accepted the money of Wil-
liams for the purpose of furnishing him marijuana. The defi-
nition of sale in the narcotics laws, both before and after the
sweeping revisions of 1955, is as follows:

"(H) 'Sale' includes barter, exchange, or gift, or offer therefor, and each such transaction made by any person, whether as principal proprietor, agent, servant, or employee." (Section 3719.01, (H), formerly Section 3719.01, (J), of the Revised Code.)

Section 1.17 of the Revised Code reads as follows:

"Any person who aids, abets, or procures another to commit an offense may be proscuted [prosecuted] and punished as if he were the principal offender."

Whether Good was the principal and represented himself alone in making this deal to furnish marijuana to Williams, or whether he was an agent, servant or employee of Sam McCants or someone else, or whether he merely was an aider or abetter is not of great importance at this point. Offers to sell, barter, exchange or give away narcotics are denounced with equal vigor in the chapter on narcotics in the Revised Code. There is simply nothing in the record as to the first meeting between these two men when the subject of narcotics was discussed to indicate any entrapment whatsoever. The fact that Good was willing to add cheating to his other accomplishments neither adds nor detracts anything to this picture. No appeal to sympathy, no long period of pressure or persuasion was required.

As to the so-called gun episode, we think it is significant that after Good was arrested and during an interrogation lasting more than an hour by three officers, they stated he failed to make any mention of it whatsoever. As before stated, Good's own story was that the alleged gun episode took place during the early part of January 1958. The offenses of which he was found guilty, occurred on February 8 and February 14, 1958.

Good seemed to delight on the stand to describe himself as a person who lived without working. While he claimed to be a painter, he admittedly had only worked a few weeks the previous twelve months. He admitted having been to Sam McCant's house three or four times before he took Williams there. It was the McCant house where, Williams said, in company with Good, he obtained two quantities of marijuana. Good admitted that he had smoked marijuana, obtained it from the fellows in the pool room and that he had used heroin. He also stated he knows 12 or 13 people who use dope.

Good again stated that as soon as Williams and he were seated at the bar, Williams asked him for marijuana and he furnished him boneset tea. He testified further, that this occurred around January 2, 1958. He also admitted that, when he delivered the sack of boneset tea to Williams, he (Good) told Williams it was marijuana. He further stated he does not work in the pool room but is a pretty good shot and "I just would be there most of the time."

Good testified further that he had been picked up by the Columbus Police Department "several times for narcotics, investigation of narcotics, * * *." He was also picked up for investigation of narcotics prior to June 1957, and in 1953 he was arrested in New York and placed on probation on a charge of illegal possession of narcotics.

In the *Sherman case, supra,* page 372, Warren, C. J., of the United States Supreme Court, wrote as follows:

"* * * To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal."

There simply is no evidence, either in Good's testimony or that of the prosecution witnesses, indicating either an entrapment or that Good was unduly hounded or persuaded. For the reasons above set forth we are of the opinion that no entrapment was shown and hence the court was correct in its ruling when it refused to dismiss the case for that reason at the end of the state's evidence and again at the end of the entire case.

We are further of the opinion that the court was correct in rejecting the special charges offered dealing with entrapment, for the reason that a charge which is given when there is no evidence to warrant it may be misleading to the jury. In the case of *Breese* v. *State,* 12 Ohio St., 146, at p. 155, 80 Am. Dec., 340, Peck, J., wrote as follows:

"It is doubtless true, that the judge should not charge the jury upon a hypothetical case, entirely without the testimony, because such a course is calculated to mislead the jury and induce them to suppose that such a state of facts, in the opinion of the court, was possible under the evidence and might be considered by them. * * *"

In the case of *State* v. *Linder,* 76 Ohio St., 463, 81 N. E., 753,

where the trial court gave a charge upon which there was no evidence in the record, the Supreme Court, at the conclusion of the second paragraph of the syllabus, made this comment:

"Such charge offends against the rule that the instructions to the jury should be confined to the case which the evidence tends to establish."

The court correctly refused to give the special instructions and a general charge upon entrapment.

Assignment nine relates to other errors apparent on the face of the record prejudicial to the defendant. Under this heading, it is complained that the court's inquiry into the qualications of the jurors was not in compliance with the statute. In support of this, counsel for Good says:

"Such was not done according to counsel's recollection in the instant case."

It has not been pointed out to us where the questioning by the court, or any part thereof, is exemplified in the record, or where any request was made of the court to conduct such interrogation, nor has it been pointed out where any right of the defendant was in any way jeopardized. We have no choice but to look at the record, and it is silent on this question. This assignment of error should, therefore, be overruled.

Being of the opinion that no error has intervened in the trial court prejudicial to the rights of the defendant, we believe the several assignments of error should be overruled and held for naught, and the judgment of the court below affirmed.

Duffy, J. The defendant, appellant herein, Ronald L. Good, was indicted by the grand jury on eight counts involving narcotics, four counts for possession for sale and four counts for sale of narcotics. The state, on its own motion, dismissed one count of possession for sale and one count of sale, and the case proceeded to trial on the other six counts of the indictment. The jury returned a verdict of guilty as to four of the counts and returned a verdict of not guilty on one charge of possession for sale and one charge of sale.

The defendant has appealed from the finding of guilty on the two counts of possession for sale and the finding of guilty on two counts of sale of narcotics. The following are the assignments of error:

1. The defendant was deprived of a fair trial.

2. The court erred in the admission of certain exhibits over the objection of the defendant, which exhibits were prejudicial to the rights of the defendant.

3. The court erred in permitting certain evidence and testimony to be admitted, which evidence and testimony were prejudicial to the rights of the defendant.

4. The court erred in not giving the special charges and instructions to the jury, as requested by the defendant.

5. The court erred in failing to include in its general charge to the jury certain instructions, as requested by the defendant (these having to do with the questions of entrapment and duress).

6. The court erred in refusing to sustain the defendant's challenge for cause of the panel of jurors called to hear the matter.

7. The court erred in refusing to dismiss the case upon motion of the defendant at the conclusion of the state's case.

8. The court erred in failing to dismiss the case upon motion of the defendant at the conclusion of all the testimony and evidence.

9. Other errors apparent on the face of the record which are prejudicial to the rights of the defendant.

The trial took four days, and the record is large; but a review of the record and of the brief of the defendant does not lead me to believe that the trial court erred as to assignments of error Nos. 2, 3, 7, 8, and 9; and the court, in considering assignments of error Nos. 1 and 6, finds that there are not sufficient facts in the record to sustain those assignments of error.

On the first assignment of error, counsel for the appellant indicates in his brief that there was a series of cases involving narcotics, all of which were assigned for hearing within a period of one week, but that they continued in trial over a period of approximately two weeks and were heard in the same courtroom before the same judge. For that reason counsel for the appellant asked the trial judge to step down and have another judge assigned to the case. This the judge refused to do. Counsel for the appellant also alleged in assignment of error No. 6 that. as the cases were heard on successive days, the jurors became

pretty well steeped in the proceedings going on and that, of the original panel called, out of the first twelve jurors seated, eleven had been on the jury which had found the preceding accused guilty, and the twelfth had been the thirteenth juror in that preceding case, so that all the original panel had heard all the same witnesses in a similar case; therefore, the entire panel was challenged for cause. This is not shown in the record, and those two assignments of error should also be overruled. The record does not show that the trial judge was biased or prejudiced against the defendant, nor is there any indication that he had prejudged the case and tried to influence the jury's opinion.

In considering the other two assignments of error dealing with the instructions and charges to the jury requested by the defendant, a review of the record reveals the following.

The principal witness for the prosecution, one Lloyd Williams, working under instructions from two members of the Columbus Police Department, came into contact with the defendant in a pool hall, and the facts are in dispute as to whether Williams asked the defendant where he could get some narcotics or whether the defendant asked Williams whether he wanted to purchase some narcotics.

The record indicates that the first two purchases made by Williams from Good proved to be purchases of nonnarcotic items sold to him under the pretense that they were narcotics. After tests by the Columbus Police Department, which conveyed the information to Williams that he had purchased nonnarcotic items from the defendant and told Williams to stay away from Good, Williams contacted the defendant on the street and asked him to go to his car with him, Williams having a gun in his jacket pocket. When he and the defendant got to Williams' car and the defendant saw the gun, he took off running, and Williams went in pursuit of him. During the chase the gun fell out of Williams' pocket, and he picked it up and continued after defendant, who finally stopped.

As to what happened during the chase and what was said afterward, the facts are in dispute; but Williams stated that he told defendant that he had sold him boneset tea, and he wanted his money back. The defendant testified that during the chase

a car had hit him on the leg as he ran across the street but that he kept on running until Williams told him to stop or he would "blow his brains out." After stopping, defendant asked Williams to put the gun away. They went to the house of defendant's girl friend and got $3, and defendant told Williams that was all the money he had. Defendant testified Williams told him that he did not care about the money but that what he wanted was some marijuana; and, defendant claimed that, when defendant told him he did not have any, Williams told him, "You find out who has some marijuana, and get it, or just find out who has some marijuana." Williams stated that he told defendant, "You burned me for my money and I want my money back, $5 the day before, and $10 yesterday." The episode involving the gun took place on or about February 4.

Defendant stated that a couple of days later Williams came up to him in the Idle-A-While Bar, where he was supposed to meet him, and asked him whether he had gotten him any marijuana. Defendant told him he had not "because I hadn't heard who had any." Defendant claims that he returned to Williams two sticks of marijuana which had been given to him by Williams following one of the purchases of the boneset tea and that Williams told him "to find out who had some marijuana, and he didn't want no more stuff out of me."

Once more the stories vary, with Williams stating that on February 8 defendant came up to him in the Idle-A-While Bar and asked him whether he wanted to buy anything, and then saying, "Let's go out to Sam McCants and see if he is home, and get some from him." They then got into Williams' car and went out to 1660 Maryland Avenue, where they contacted Sam McCants. Defendant got out of the car, went in to talk to McCants, and reported to Williams that all McCants had was bulk pack of marijuana. Williams gave defendant $10, and defendant went up to the hill where McCants was standing. As they met, Good gave McCants the $10, and McCants gave him an envelope. Good came back down the hill and gave the envelope to Williams. This envelope was later found to contain ground leaves of the plant *cannabis sativa*, which is commonly known as marijuana, and forms the basis for counts three and four against the defendant.

Defendant says that a few days previous, Williams asked him whether he found out anything and that he told Williams he had heard through another fellow that McCants had some marijuana; that Williams said, "Let's go out there"; and that they then got into Williams' car and went to McCants' house. McCants was not at home, so they left. Defendant says that, as Williams let him out, Williams told him that "the next time he saw me, he wanted me to know where some marijuana was."

Defendant says that the first time he and Williams contacted McCants was around February 8. At that time he was at the poolroom shooting pool when Williams came in, called to him, and told him, "Come on out here now; anyhow, I want to speak to you on some business." Defendant put up his pool stick; and Williams asked him to go back to McCants' house and told defendant, "I got to get me some marijuana." Defendant said that, when they got to McCants' house, Williams told him to go in first and see if McCants had any marijuana; that he went into McCants' house and then came back to the car and told Williams that McCants did have some marijuana. McCants then came out of the house; Williams says he gave defendant $10 and told him to get the marijuana. Defendant then took the $10 and handed it to McCants. McCants handed defendant a bag which he, in turn, handed to Williams. Williams then told him to get back in the car and brought him back to the poolroom.

Approximately six days later, on or about February 14, the transaction forming the basis for the indictment on the fifth and sixth counts against defendant took place. Williams' testimony in regard to that day was to the effect that he was once more in the poolroom when defendant came up to him, asked him whether he wanted anything, and told him that they would go out to McCants'. They went out to McCants' and pulled up behind his place. Defendant went in, came out in about five or ten minutes, and got $10 from Williams. McCants then came out, and Good told him to go ahead and get the stuff. Williams and Good waited in the car a couple of minutes; and as McCants came toward the car, Good got out, walked up to him, and handed McCants $10. McCants handed him an envelope; Good came over to the car, got in, and handed Williams the en-

velope. They sat in the car a couple of minutes; then McCants came over and got in, and Good introduced Williams to McCants.

Defendant Good's version of the purchase on February 14 was that he was in the poolroom when Williams came up to him and told him he had been out to McCants', that he was not home, and that he wanted Good to go back out there with him. Good told Williams that he did not need him to go out with him, that he could go out by himself; but Williams said, "I want you to go out there with me because you still owe me money." They then got into Williams' car, and Williams pulled up behind the house as McCants was getting ready to leave. He came over to the car to see who was there and asked Good who Williams was. Williams gave the $10 to McCants and merely asked Good to get the bag from McCants.

Defendant contends that, based upon the conflicting evidence of Good and Williams, there was a question of entrapment for the jury, and that, because of the gun episode, the court should have charged on the matter of whether Good was acting under duress in these purchases of marijuana.

The defense of entrapment is available to an accused only where he has been induced or lured, for the purpose of prosecution, into the commission of a crime which he otherwise had no intention of committing. State v. Miller, 85 Ohio App., 376, 88 N. E. (2d), 614. In the Miller case the court stated at page 378:

"* * * The rule in this state seems to be that when the doing of a particular act is a crime, regardless of the consent of anyone, if the criminal intent originates in the mind of the accused, and the criminal offense is completed, the fact that an opportunity is furnished, or that the accused is aided in the commission of the crime in order to secure the evidence necessary to prosecute him therefor, constitutes no defense. * * * On the other hand, the defense is available to one who is induced or lured by an officer of the law or other person for the purpose of prosecution into the commission of a crime which he otherwise had no intention of committing. * * *"

The defendant in this case was charged with possession for sale and sale of a narcotic. The record does not indicate that the defendant was a known seller of narcotics, although there is evidence that he was a user of narcotics. There is evidence

that the police officers who were directing the activities of Williams told him to leave the defendant alone, and that, thereafter, the gun episode and the two purchases from McCants took place. The only evidence of possession for sale was the possession of the narcotic by the defendant when he took the envelope from McCants and handed it to Williams. The only evidence of sale was the receiving of the money from Williams, transmitting the money to McCants, receiving the envelopes or bags, and giving them to Williams. These incidents all took place outside the Maryland Avenue home of McCants. In view of the defendant's testimony regarding the gun incident, the advice of the police officer to stay away from Good, the alleged repeated requests by witness Williams that he get some narcotics, the driving of the defendant to McCants' house by Williams, and the furnishing of the money when the defendant was already a debtor of Williams by reason of the sale of fake narcotic items, there was a question which should have been submitted to the jury as to whether Good intended to engage in the crime with which he was charged or whether the idea originated in the mind of Williams, and whether it was at Williams' insistence or urging that Good took him to McCants'. From Williams' testimony the jury could have come to the same conclusion that it did; however, the trial judge should have given the requested charge on the question of entrapment. The jurors could have believed the defendant's testimony; and since he did admit to the transactions and took the stand in his own defense, he was entitled to have the jury properly instructed on the law covering his defense of entrapment.