(No. 35978.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* MILTON McSMITH, Plaintiff in Error.

*Opinion filed September 22, 1961.*

Russell E. Davis, and Howard T. Savage, both of Chicago, for plaintiff in error.

William L. Guild, Attorney General, of Springfield, and Benjamin S. Adamowski, State's Attorney, of Chicago, (Fred G. Leach, Assistant Attorney General, and Francis X. Riley, and James R. Thompson, Assistant State's Attorneys, of counsel,) for the People.

Mr. Justice Daily delivered the opinion of the court:

After a bench trial in the criminal court of Cook County, the defendant, Milton McSmith, was convicted of unlawfully selling narcotic drugs and was sentenced to the penitentiary for a term of 10 to 15 years. He prosecutes this writ of error for review, contending that the evidence in the record establishes a defense of entrapment as a matter of law. Before looking to the factual setting for this claim, an analysis of the legal principles it invokes will best serve to clarify and narrow the issue presented.

Entrapment is recognized in this jurisdiction as a valid defense, and has been defined as the "conception and plan-

ning of an offense by an officer, and his procurement of its commission by one who would not have perpetrated it except for the trickery, persuasion, or fraud of the officer." (*Sorrells* v. *United States,* 287 U.S. 435, 454, 77 L.ed. 413, 423.) Stated differently, entrapment is established where it appears that officers of the law or their agents incited, induced, instigated or lured the accused into committing an offense which he otherwise would not have committed and had no intention of committing, and if a criminal design or intent to commit the offense originates in the mind of the one who seeks to entrap the accused, and who lures him into its commission merely for the purpose of arresting and prosecuting him, no conviction may be had. (14 I.L.P., Criminal Law, sec. 50.) At the same time, however, a distinction based upon public order has been drawn between inducing an innocent man to do an unlawful act, and setting a trap by the use of decoys, artifice and deceit to catch one in the execution of a criminal act of his own conception and design. Thus is it that entrapment is not available as a defense to a person who has the intent and design to commit a criminal offense, and who does commit the essential acts constituting it, merely because an officer of the law, for the purpose of securing evidence, affords such a person the opportunity to commit the criminal act, or purposely aids and encourages him in its perpetration. 14 I.L.P., Criminal Law, sec. 50; see also: *Sorrells* v. *United States,* 287 U.S. 435, 77 L.ed. 413; *People* v. *Outten,* 13 Ill.2d 21; *People* v. *Clark,* 7 Ill.2d 163; *People* v. *Guagliata,* 362 Ill. 427; 15 Am. Jur., Criminal Law, secs. 335-336; 22 C.J.S., Criminal Law, sec. 45.

In an extensive annotation dealing with entrapment to commit offenses in violation of narcotic laws, it is said in 33 A.L.R.2d 883, at 886: "The cases within the scope of the annotation support the conclusion that the defense of entrapment cannot be successfully interposed by one accused of a narcotics offense if he was already engaged in

an existing course of similar crimes, or if he had already formed the design to commit the crime with which he was charged, or similar crimes, as where he offered to make a sale prior to any solicitation, or was willing to do so, as shown by ready complaisance, * * *." See also: *United States* v. *Perkins,* (7th cir.) 190 F.2d 49; *People* v. *Guagliata,* 362 Ill. 427.

Turning to the facts of the instant case, it is undisputed that James Bailey, a Federal narcotics agent, obtained narcotics from defendant on two occasions in August, 1958. Likewise uncontroverted is the fact that Bailey was brought into contact with defendant by Ruth Killingsworth, an informer in the employ of Federal narcotics agents, who either was, or pretended to be, a narcotics addict. The sole issue is, rather, whether the manner in which the sales to Bailey were developed and set up by the informer served to induce an otherwise innocent person to commit a criminal act, or whether defendant was "already predisposed to commit the act and exhibited only the natural hesitancy of one acquainted with the narcotics trade." See: *Sherman* v. *United States,* 356 U.S. 369, 371, 2d L. ed. 2d 848, 851.

Ruth Killingsworth, the informer, did not appear as a witness in the cause, (and defendant stated to the court that his efforts to locate her had been unsuccessful,) with the result that defendant was the sole witness to testify concerning the events preceding his sale of narcotics to agent Bailey.

In August, 1958, according to defendant, he lived with his wife and two children in an apartment at 4405 Indiana Avenue in Chicago. He was unemployed and had found it difficult to obtain work because he had served three years in the penitentiary for the crime of burglary. Although steadfastly denying that he had ever used narcotics or engaged in its traffic before, defendant admitted he had been arrested "for narcotics" in June, 1957, but said that the charge against him had been dismissed. He had been ac-

quainted with Ruth Killingsworth, whom he referred to as Big Ruth, for about six years and he testified she had approached him on the street on August 3 or 4, at which time she engaged him in a perfunctory conversation and inquired as to who "had some good stuff around here." Defendant told her he didn't know, that he didn't use narcotics, and suggested that she go to a nearby tavern where narcotics addicts congregated. He met her again in a restaurant the same night and on this occasion she told him there weren't any good narcotics in the area, that she had been sold diluted drugs, and that she had wasted considerable money. Defendant said she again asked him if he knew where she could obtain narcotics and that he again told her he did not.

Continuing with defendant's testimony, he related that his next meeting with the informer occurred two or three days later on the street. At this time she first attempted to sell him a shirt, then produced two or three hundred dollars and told him she had been trying all day to "get something nice." She purportedly asked defendant if he knew a fellow called "Bug Hair," remarking she had heard he had good narcotics, and when defendant replied he "had seen Bug Hair around," she asked defendant to talk to the man for her. At this, defendant inquired: "What's in it for me?" and the informer allegedly told him he could make some money on the transaction inasmuch as he could acquire the drugs cheaper from a supplier because he was a non-addict. Defendant then agreed to see Bug Hair and did so at 1:00 or 2:00 A.M. of the next morning, at which time the latter agreed to sell him heroin for $100 an ounce. He sought to contact Big Ruth the same morning at a telephone number she had given him, but was unsuccessful.

The following day, which was August 11, Ruth telephoned defendant and his version of their conversation was that he told her he thought he "had gotten some action" and to come to his apartment, and that he gave his consent when she represented she would have to bring her husband along.

With regard to what happened thereafter, the record is in some conflict.

Defendant first gave testimony from which it would appear that no sale of narcotics was made on this occasion, and that the parties did no more than to sit in the kitchen of his apartment and to discuss the informer's need for narcotics and whether defendant could be relied upon to provide undiluted drugs. From his later testimony, however, it appears certain that he did sell an ounce of heroin to Bailey at that time. According to defendant, he had no narcotics on the premises and after Bailey had paid him $125 for an ounce of heroin, he left the apartment, telephoned Bug Hair, and, about an hour later, met a messenger who delivered the narcotics at the rear of defendant's apartment. He took the package to Bailey, who had been waiting in the kitchen with the informer, and when Bailey complained that the package felt light, its contents were measured with a measuring spoon found in the kitchen.

Bailey, however, testified to an entirely different version of the August 11 transaction. He stated that the preliminary conversation concerned amounts and prices, with defendant representing there was no limit to the amount he could furnish, and that it was finally agreed Bailey could purchase one ounce of heroin for $150, or four ounces at $135 an ounce. When Bailey said he would buy one ounce as a trial, defendant went from the kitchen to a front room of the apartment, taking a sifter and a measuring spoon with him, and returned with a quantity of powder from which he measured four spoonfuls of a quarter-ounce each. Bailey then paid defendant $150 and after he had requested and received permission to use the bathroom to test the powder, defendant left the apartment saying he would "see if everything was all right." During the latter's absence Bailey tested the powder and found it to be heroin, and when defendant returned fifteen minutes later he explained his long absence by saying he "had to get the money out of the

house." Defendant denied completely that the sale had been consumated in the manner to which Bailey testified.

Both Bailey and defendant were in accord that another transaction was made on August 26, but again there was complete disagreement as to its details. Agent Bailey testified that he and the informer went to the apartment at about 7:30 P.M., where after some haggling over the price, defendant agreed to sell him four ounces of heroin at $125 an ounce. Defendant purportedly said that he had only two ounces left, because he had had a "big day," and the two men then went to a bedroom where defendant took a tin foil package out of a dresser drawer, measured out an ounce of heroin and gave it to Bailey. The agent said defendant also took some money from a box in the drawer, one bill being of a $100 denomination, and stated he wanted full payment in advance for the four ounces because he needed the money to pay for a large shipment he was expecting. Thereupon, Bailey paid the $500, defendant left the apartment and the agent waited some three to four hours until defendant returned and handed him three more ounces of heroin. The agent then departed and, when testifying, explained that no immediate arrest of defendant had been made because it was hoped to discover his supplier.

Defendant expressly denied the testimony of Bailey in all its essential aspects and, while he admitted selling the agent one ounce of heroin for $125 on this occasion, it was his testimony that he had no narcotics on the premises and that he had left the apartment and purchased an ounce of heroin from Bug Hair just as he did for the first transaction. On cross-examination he conceded there had been a transaction where three ounces of narcotics had been sold to Ruth Killingsworth, but was inconsistent as to its date and circumstances. At one stage of his examination, the reasonable intendment from his testimony is that he had procured three packets of drugs for the informer the night of August 26, that he gave the packets to a girl to deliver

to Big Ruth, and that the latter paid him $360 therefor two or three days later. At another stage of his testimony, however, he said the sale to Big Ruth had been made two or three days "after the first transaction," at which time she met him on the stairway of his apartment and gave him some money. He said he then got in touch with a fellow and obtained three packets of narcotics which he gave to a girl, whom he did not identify, with instructions to take them to his apartment and to tell his wife to give them to Big Ruth. Concluding his testimony, defendant related that Bailey returned to the apartment about a week after August 26 and sought to purchase $100 worth of narcotics. He said he went out and left Bailey waiting in the apartment all night, then told him that he, the defendant, wanted nothing more to do with Bailey or his woman because they had stolen a watch from the apartment.

Subsequently, on September 10, 1958, Bailey signed a complaint against defendant, a warrant was issued and the latter's arrest was effected by Chicago police on October 29, 1958.

Even if we assume that defendant's testimony was true in all its aspects, it is our opinion that such testimony, standing alone, shows such ready complaisance on his part to commit the crime in question that the defense of entrapment cannot validly be asserted. Stated otherwise, it is our conclusion that the Federal agents and their employee did no more than to afford defendant an opportunity to commit a crime which he was ready and willing to commit. While defendant professed to have no knowledge of where narcotics could be obtained on the occasions of his first two meetings with the informer, it is readily apparent from subsequent events that by his denials he sought no more than to exhibit the natural caution and hesitancy that could be expected from one engaged in the illegal narcotics trade. Even then, he did not portray the naivete now claimed, for he referred the informer to a tavern where narcotics addicts

could be found. When the informer, upon the occasion of the third meeting, exhibited a substantial sum of money, defendant was quick to jump to the opportunity and within a matter of hours, acting entirely upon his own knowledge and devices, was able to contact a supplier and purportedly to enter into an agreement for the first time whereby he could purchase narcotics in substantial quantities. Considering the stealth, secrecy and caution with which the traffic in narcotic drugs is carried on, we think that defendant's quick and ready access to a source of supply, as well as his promptness in contacting the supplier, are incompatible with his claim that he was a law-abiding person who was lured into the commission of crime. The circumstances in the record reflect, rather, a familiarity with and a place in the area of criminality involved, and an intent on defendant's part to commit the crime when opportunity afforded, once he had assured himself it was profitable and safe. Under such circumstances, the defense of entrapment will not lie. Cf. *United States* v. *Perkins,* 190 F.2d 49; *Conway* v. *United States,* 1 F.2d 274; *State* v. *Good,* 110 O. App. 397, 169 N.E.2d 468; *Lucadamo* v. *United States* 280 Fed. 653.

Although defendant urges that *Sorrells* v. *United States,* 287 U.S. 435, 77 L.ed. 413, and *Sherman* v. *United States,* 356 U.S. 369, 2 L. ed. 2d 848, command a different result, those decisions are distinguishable when their facts are stated. In *Sorrells,* the accused twice told a Federal agent that he did not have any intoxicating liquor, but succumbed to a third request after the agent deliberately gained his ear and aroused his sympathy by discussing war experiences. Under these facts the Supreme Court held the trial court had erred in holding there was no entrapment as a matter of law and in refusing to submit the issue to the jury. In *Sherman,* the accused was lured into supplying narcotics to an informer by the latter's repeated representations that he was a fellow addict suffering for need of drugs, and it was the decision of the high court that such evidence established

entrapment as a matter of law. Seeking to find application for these decisions, defendant asserts that the informer in this case, after twice failing to obtain his assistance, lured him into the commission of a crime with money at a time "when he was unemployed, unable to find and obtain employment, the father of children and the husband of a pregnant wife." The fallacy in this argument is that the record is devoid of any showing that the informer knew of defendant's unemployment and personal situation, or that she dangled them in front of him in an effort to instigate his crime. Moreover, as the People have so aptly pointed out, defendant's motive in securing narcotics did not stem from the reminiscences of a wartime comrade-in-arms, or from the anxious pleas of suffering on the part of a fellow addict, but from a self-confessed motive of "What's in it for me?" In short, no appeal to sympathy or long period of pressure or persuasion was required in this case.

As a final contention defendant asserts that the evidence does not show that he sold narcotics, but merely that he obtained them as an agent for Bailey and the informer. While, in the face of agent Bailey's testimony, we think that any claim that defendant was acting as agent was refuted, we have already pointed out in *People* v. *Shannon,* 15 Ill.2d 494, 496-497, that under our statute an agent in a narcotics transaction is to be treated as a seller.

The judgment of the criminal court of Cook County is affirmed.

*Judgment affirmed.*