THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* BILL TIPTON, Defendant-Appellant.

Fifth District   No. 76-279

Opinion filed January 30, 1979.

194

JONES, J., dissenting.

Michael J. Rosborough and A. Michael Kopec, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Nicholas G. Byron, State's Attorney, of Edwardsville (Bruce D. Irish and John A. Clark, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE GEORGE J. MORAN delivered the opinion of the court:

Defendant appeals from his conviction of the offense of unlawful delivery of a substance represented to be a controlled substance in violation of section 401 of the Illinois Controlled Substance Act (Ill. Rev. Stat. 1975, ch. 56½, par. 1401).

He contends (1) that the State did not prove him guilty beyond a reasonable doubt on the issue of entrapment, and (2) that the trial court committed reversible error when it allowed evidence of a subsequent crime to be introduced into evidence on the theory that it was relevant to the issue of his predisposition to commit the offense for which he was being tried.

The affirmative defense of entrapment is defined by section 7—12 of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 7—12) which provides:

> "A person is not guilty of an offense if his conduct is incited or induced by a public officer or employee, or agent of either, for the purpose of obtaining evidence for the prosecution of such person. However, this Section is inapplicable if a public officer or employee, or agent of either, merely affords to such person the opportunity or facility for committing an offense in furtherance of a criminal purpose which such person originated."

The trial court gave the following instruction to the jury:

> "It is a defense to the charge made against the defendant that he was entrapped, that is, that for the purpose of obtaining evidence against the defendant or another he was incited or induced by a public officer or employee or an agent of a public officer or

employee to commit a crime which he otherwise would not have committed.

However, the defendant was not entrapped if a public officer or employee or an agent of a public officer or employee merely afforded to the defendant the opportunity or facility for committing a crime which he was willing to commit in furtherance of a criminal purpose which the defendant originated." Illinois Pattern Jury Instructions, Criminal, No. 24.04 (2d ed. 1971).

The case for the State was presented chiefly through the testimony of a special agent for the Metropolitan Enforcement Group of Southwestern Illinois (MEGSI).

Defendant was introduced to undercover MEGSI Agent Michael Boyne by paid informant Nancy Niehaus, a woman who defendant had recently dated for a period of three to four weeks. The initial meeting of the defendant, Agent Boyne, Agent Charles Nunn, and informant Niehaus took place at the home of Bill Tipton on September 1 or 2, 1975. Agent Boyne testified that a general conversation ensued and Nancy Niehaus asked the defendant if he could get some cocaine for Agent Boyne and her. Tipton made two or three phone calls in the presence of Agent Boyne but was unsuccessful in making contact with the person called. Boyne and Niehaus left the Tipton home without a commitment by the defendant to procure a source of cocaine for them. Tipton testified that he subsequently received three phone calls from informant Niehaus over the course of 36 hours inquiring as to whether a source of cocaine had been located. She reminded him continually that he would be "doing her a favor" if such a source could be located for her and Mike. The third call from Niehaus to Tipton produced the name of the source of the cocaine. The fourth call from Niehaus to Tipton was made for the purpose of setting up a meeting between Boyne and a person named Steve Jones. Niehaus indicated that she would give the money for the drug transaction to Boyne and that he would make the purchase of the cocaine.

During this same time period, defendant Tipton also received "two or three" calls from Agent Boyne asking if a source of cocaine had been lined up. The last call from Boyne, made just shortly after the fourth and final call from Niehaus, produced a scheduled meeting between Boyne and Steven Jones, the source of the substance. The meeting was set for 6 p.m., September 3, 1975, at the Funland Miniature Golf Course, Pontoon Beach, Illinois.

Agent Boyne proceeded from his office to the Tipton residence in Pontoon Beach. Boyne stopped the car in front of the house, sounded the horn, and Bill Tipton came out of the house. Tipton ultimately rode to the golf course with Boyne. Boyne and Tipton were playing pinball inside the premises when Steven Jones entered shortly before 6 p.m. Agent Boyne

and Jones were introduced. Tipton asked Jones if he had the "stuff" and Jones replied that he did. Jones suggested that they leave the building and go out to the car. The testimony at this point is contradictory as to whether Boyne had to prompt the defendant to go to the car with him for the drug transaction, but it is clear that Tipton did in fact enter the car with Boyne and Jones. Jones sat behind the wheel, Boyne sat on the front passenger side, and Tipton sat behind Jones in the back seat.

According to Boyne, there was a general conversation between Agent Boyne and Jones. Tipton apparently did not participate in this conversation. Immediately thereafter, Steven Jones produced an aluminum foil package which he said contained half cocaine and half "speed." Agent Boyne tendered $30 of official MEGSI funds which was accepted and exchanged for the small aluminum foil package. Boyne left shortly thereafter, indicating that he had to pick up his father.

Neither Nancy Niehaus nor Charles Nunn was called to testify by the State in this case. In addition, Boyne did not have a record of his conversation with defendant, Niehaus and Nunn in the report he had made to MEGSI on this incident.

Defendant Tipton testified that he did numerous odd jobs in addition to attending school. He knew Nancy Niehaus as he went out with her for a short time. She came by his house in September of 1975 accompanied by Mike Boyne and "another guy." He had never met either of the men before. They did not talk about drugs that day. The next day Nancy called and asked if he could get her some cocaine. He replied that he would have to see. She called him later and asked him to try. She said he would be doing her a big favor. He did not think about it any more until she called him back and asked if he had found anyone to sell cocaine to her. He told her no, not yet. The next day he met Steve Jones. It was pretty common knowledge at school that Jones was into drugs. Nancy again called him back and he gave her Steve Jones' name. Later Mike Boyne came by his house and the defendant told Boyne he could meet Steve at the mini golf course but Boyne persuaded him to go along. He accompanied Boyne to the golf course where the sale was consummated.

Did the State prove beyond a reasonable doubt that the defendant was not entrapped by the MEGSI agents? In order to put the entrapment defense in its proper perspective, it is necessary to examine the evolution of the defense since its initial recognition by the Supreme Court in *Sorrells v. United States*, 287 U.S. 435, 77 L. Ed. 413, 53 S. Ct. 210 (1932). The court in *Sorrells* announced general public policy guidelines relevant to the recognition of the entrapment defense:

> "When the criminal design originates, not with the accused, but is conceived in the mind of government officers, and the accused is by persuasion, deceitful representation, or inducement lured into

the commission of a criminal act, the government is estopped by sound public policy from prosecution therefor." (287 U.S. 435, 445, 77 L. Ed. 413, 418, 53 S. Ct. 210.)

The majority in *Sorrells* stated that the conduct of the defendant, as well as the background of the defendant, be opened up for exploration by the State once the defense of entrapment was raised at trial.

> "The predisposition and criminal design of the defendant are relevant. But the issues raised and the evidence adduced must be pertinent to the controlling question whether the defendant is a person otherwise innocent whom the government is seeking to punish for an alleged offense which is the product of the creative activity of its own officials. If that is the fact, common justice requires that the accused be permitted to prove it. The Government in such a case is in no position to object to evidence of the activities of its representatives in relation to the accused, and if the defendant seeks acquittal by reason of entrapment, he cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue." 287 U.S. 435, 451, 77 L. Ed. 413, 422, 53 S. Ct. 210.

The Warren court stated the pivotal test of the entrapment defense succinctly in *Sherman v. United States*, 356 U.S. 369, 2 L. Ed. 2d 848, 78 S. Ct. 819 (1958):

> "To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal." (356 U.S. 369, 372, 2 L. Ed. 2d 848, 851, 78 S. Ct. 819.)

Mr. Justice Rehnquist, writing for the majority in *United States v. Russell*, 411 U.S. 423, 36 L. Ed. 2d 366, 93 S. Ct. 1637 (1973), expressly acknowledged this shift in emphasis by the court in *Sherman* and noted that "[t]his Court's opinions in *Sorrells v. United States, supra,* and *Sherman v. United States, supra,* held that the principal element in the defense of entrapment was the defendant's predisposition to commit the crime." 411 U.S. 423, 433, 36 L. Ed. 2d 366, 374, 93 S. Ct. 1637, 1643.

The court in *Russell* rejected an entrapment defense raised by a defendant who had been supplied a scarce ingredient by a government agent which was necessary for the manufacture of "speed." Although the ingredient was legal to possess, it was difficult to legitimately obtain except by regulated drug manufacturers. The majority opinion in *Russell* disallowed the entrapment defense and asserted:

> "*Sorrells* and *Sherman* both recognize 'that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution,' [citations]. Nor will the mere fact of deceit defeat a

prosecution, see, *e.g.*, *Lewis v. United States*, 385 U.S. 206, 208-209, [17 L. Ed. 2d 312, 87 S. Ct. 424] (1966), for there are circumstances when the use of deceit is the only practicable law enforcement technique available. It is only when the Government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play." 411 U.S. 423, 435-36, 36 L. Ed. 2d 366, 375-76, 93 S. Ct. 1637, 1644-45.

The court in *Russell* rejected the entrapment defense on two grounds. First, and most significant, the defendant-respondent conceded that he was predisposed to engage in the type of illegal drug manufacturing activities with which he was charged. Second, the court sanctioned the conduct of the law enforcement officer who sold the propanone to the respondent.

"The illicit manufacture of drugs is not a sporadic, isolated criminal incident, but a continuing, though illegal, business enterprise. In order to obtain convictions for illegally manufacturing drugs, the gathering of evidence of past unlawful conduct frequently proves to be an all but impossible task. Thus in drug-related offenses law enforcement personnel have turned to one of the only practicable means of detection: the infiltration of drug rings and a limited participation in their unlawful present practices. Such infiltration is a recognized and permissible means of investigation; if that be so, then the supply of some item of value that the drug ring requires must, as a general rule, also be permissible." (411 U.S. 423, 432, 36 L. Ed. 2d 366, 373-74, 93 S. Ct. 1637, 1643.)

The conclusion of the court was that the concession of the defendant that he was predisposed to commit the offense with which he was charged essentially made unnecessary an inquiry into the conduct of the law officials in supplying the propanone to the defendant.

"While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, cf. *Rochin v. California*, 342 U.S. 165, [96 L. Ed. 183, 72 S. Ct. 205, 25 A.L.R.2d 1396] (1952), the instant case is distinctly not of that breed." 411 U.S. 423, 431-32, 36 L. Ed. 2d 366, 373, 93 S. Ct. 1637, 1643.

The most recent Supreme Court case to entertain the entrapment defense, *Hampton v. United States*, 425 U.S. 484, 48 L. Ed. 2d 113, 96 S. Ct. 1646 (1976), also involved an admission by the defendant that he was predisposed to sell heroin. The heroin, illegal to possess or sell, had been supplied to the defendant by a government agent. Mr. Justice Rehnquist,

again writing for the majority, reaffirmed and extended the holding of *Russell*:

> "The remedy of the criminal defendant with respect to the acts of Government agents, which, far from being resisted, are encouraged by him, lies solely in the defense of entrapment. But, as noted, petitioner's conceded predisposition rendered this defense unavailable to him." (425 U.S. 484, 490, 48 L. Ed. 2d 113, 118, 96 S. Ct. 1647, 1650.)

The court in *Hampton* seemingly adopted a per se rule that a defendant conceding predisposition to engage in illegal endeavors is precluded from raising an entrapment defense.

Was the defendant predisposed to commit the crime with which he was charged? Certainly the defendant has not conceded that he was predisposed to engage in drug-related activities. On cross-examination by defense counsel, Agent Boyne testified to the extent of his knowledge concerning the tendency of Bill Tipton to deal in drugs:

> "Q: When was the first time in your life that you saw Bill handle drugs?
>
> A: I've never seen him handle drugs.
>
> Q: When was the first time in your life that you saw Bill get money for drugs?
>
> A: I never have.
>
> Q: Neither time, did you?
>
> A: No, sir.
>
> Q: You've never seen Bill handle drugs, have you?
>
> A: No, sir.
>
> Q: Have you ever seen Bill around any drugs? Were there drugs in his room the day you were there?
>
> A: I have no idea.
>
> Q: Did he offer you any drugs?
>
> A: No, sir.
>
> Q: Officer, at any time did Bill solicit you to sell drugs?
>
> A: Not to me, no, sir.
>
> Q: He never came to you to buy drugs, did he?
>
> A: No, sir."

The conclusion to be reached from this exchange between defense counsel and Agent Boyne is that Boyne had no knowledge of any prior dealing by the defendant in drug-related activities. To Boyne's knowledge, Tipton was not predisposed to deal in drugs.

It is argued that Tipton had established his predisposition and his guilt in an exchange which occurred on cross-examination between the Assistant State's Attorney and the defendant:

"Q: Okay. Now, Bill, how long had you been going out with Nancy Niehaus?

A: Three or four weeks.

Q: Had you kind of broken up with her before this happened?

A: Yes, sir, we were never going together, we were just dating.

Q: Had you stopped dating her at the time?

A: Yes, sir.

Q: Now, when she called you and asked if you could get cocaine for her, did she tell you where to get the cocaine?

A: No, sir.

Q: Okay, who originated that idea? Was that you?

A: Yes.

Q: When you found out about Steve Jones?

A: Yes, sir.

Q: The idea of having Steve Jones get the drugs and getting back to Nancy was your idea?

A: Yes, sir.

Q: Okay, and you called Steve Jones, didn't you?

A: Would you explain that?

Q: You're the guy that contacted Steve Jones, aren't you?

A: Yes, sir, whenever I could.

Q: Nancy didn't contact Steve Jones to set up this thing, did she?

A: No, sir.

Q: Mike Boyne didn't, did he?

A: No, sir.

Q: You're the one that set it up with Steve Jones, is that right?

A: Yes, sir.

Q: You said that the reason you did it was because Nancy said you would be doing her a favor.

A: Yes, sir."

This argument focuses on "who originated that idea" referred to in the fifth question asked by the Assistant State's Attorney. "That idea" gets its meaning from the previous question, "* * * did she tell you where to get the cocaine?" But that is not the pertinent question to be determined in assessing whether the defendant was predisposed to commit the offense. It will be recalled that the language in *Russell* goes to this issue. "It is only when the Government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play." (411 U.S. 423, 436, 36 L. Ed. 2d 366, 376, 93 S. Ct. 1637, 1645.) The essential question, assuming no predisposition has been demonstrated, is who originated the idea to commit the criminal offense under consideration; not how the offense, once implanted, would be carried out. The exchange between the prosecutor and the defendant relates to how

the cocaine was to be physically obtained—not where the *idea* to obtain the cocaine originated. Clearly, Nancy Niehaus, the paid informant, originated the idea of the defendant obtaining some cocaine for her: "Q: Now, when she called you and asked if you could get cocaine for her * * *?" This exchange between the prosecutor and the defendant does not establish the predisposition of the defendant to commit the offense.

Neither does the fact that the defendant knew of Steve Jones, the supplier of the "cocaine" in this case, establish that the defendant was predisposed to engage in drug-related activities. It is not significant in itself that the defendant was aware of a person who could be contacted to obtain drugs. Given the alarming rate of drug usage among young people of high school age, it is not an anomaly that Bill Tipton was aware of such an individual.

■■ Did the trial court err in permitting the State to introduce, over timely objection, evidence of a transaction involving Agent Boyne and defendant Tipton which occurred subsequent to the September 3, 1975, exchange under consideration here? At issue is whether this is an appropriate inquiry into the defendant's own conduct and predisposition. The case of *United States v. Daniels,* 572 F.2d 535 (5th Cir. 1978), is persuasive on this point:

> "The defense of entrapment is intended to protect otherwise innocent persons who have been induced by the government to break the law. To show that at some later date the person who has been innocent before being entrapped participated in a single pursuit of like conduct may have some relevancy, but its probative value is substantially outweighed by the danger of unfair prejudice to the defendant." (572 F.2d 535, 538.)

The danger of unfair prejudice to the defendant of allowing into evidence the subsequent October 1 transaction involving Boyne and Tipton therefore makes this particular effort by the State an "inappropriate inquiry." The evidence of the October transaction should not have been allowed into evidence by the trial court. Our conclusion is supported by the case of *People v. Stadtman,* 59 Ill. 2d 229 (1974), where it was contended that the admission of evidence of defendant's prior use and possession of marijuana was reversible error. The supreme court agreed, saying:

> "Here the testimony concerning defendant's prior possession and use of marijuana would prove nothing other than his propensity to commit the offense with which he was charged, and in admitting it into evidence the trial court erred." 59 Ill. 2d 229, 232.

After careful consideration we conclude that the defendant exhibited no predisposition to commit the criminal offense with which he was charged. The lack of predisposition distinguishes this case from the cases

of *Russell* and *Hampton.* The lack of predisposition permits a shift in focus to the conduct of the law enforcement officials in pursuing and apprehending those engaged or about to engage in criminal activities. The inquiry thus shifts to the propriety of the conduct of the law enforcement officials in relation to the commission of the criminal offense by the defendant.

The court in *Russell* indicated that it was acceptable for government agents to infiltrate drug rings and to participate in a limited manner in their unlawful practices. This result is necessitated by the operation of large, highly complex drug networks. In the present case, however, such is not the situation. The defendant here was operating at the request of his former girlfriend in an individual capacity. Is the conduct of the government's drug enforcement agents to be considered appropriate in this type of situation? The conduct sanctioned in *Russell* does not seem to be appropriate when considered in light of the factual setting of this case. Rather, the type of conduct permissible for government agents in situations such as this must be evaluated in light of the Supreme Court's decision in *United States v. Sorrells,* 287 U.S. 435, 77 L. Ed. 413, 53 S. Ct. 210 (1932). The court in *Sorrells* held that the petitioner had been entrapped by the conduct of the liquor agent in procuring a half-gallon of whiskey during Prohibition. (After a lengthy discussion of military experiences—the agent had been in the same AEF Division during World War I as petitioner—and repeated requests for liquor, the petitioner left the residence and returned shortly thereafter with the whiskey which he sold for five dollars.) The court held that the sole purpose of the agent's visit to the residence of the petitioner was to obtain evidence for the prosecution of the petitioner for obtaining and selling liquor. The petitioner was lured into the commission of the offense by the persuasive forces of camaraderie. Although the petitioner actually procured the liquor, the court looked beyond this particular conduct and determined that the criminal intent originated with the liquor agent. The conviction of the petitioner was reversed.

Likewise, in this case, the continuous requests and persistent appeals to friendship had the same effect on Bill Tipton. The requests, however, may have been even more devastating on this particular defendant. He was described as being shy and reserved, especially around females. Nancy Niehaus was one of his very few female friends, and he did not want to lose her friendship. After some initial hesitation and a total of five phone conversations within a 36-hour period, the defendant agreed to arrange a meeting with Steven Jones. As stated in analyzing the cited testimony of defendant, the criminal intent originated with Nancy Niehaus and Mike Boyne. The defendant merely determined where he

could get the cocaine once the idea of becoming involved in this venture had been implanted in his mind by the two government agents.

The defense of entrapment (Ill. Rev. Stat. 1975, ch. 38, par. 7—12) is an affirmative defense (Ill. Rev. Stat. 1975, ch. 38, par. 3—2).

"If the defendant presents some evidence to raise the issue of entrapment, 'the State must sustain the burden of proving the defendant guilty beyond a reasonable doubt as to that issue together with all other elements of the offense.' Ill. Rev. Stat. 1969, ch. 38, par. 3—2(b)." (*People v. Dollen*, 53 Ill. 2d 280, 284, 290 N.E.2d 879 (1972).)

The defendant presented evidence which raised the entrapment defense. The burden then shifted to the State to rebut the testimony of the defendant. Agent Boyne attempted to do this, but by his own admission, he knew nothing of Bill Tipton prior to the initial September meeting at the Tipton residence. He also testified on cross-examination that he did not even know the informant, Nancy Niehaus, prior to this date:

"Q: [Defense counsel] Now, had you ever met or heard of Bill before that date?

A: No, sir.

Q: Now, did you tell Mr. Brown [the prosecutor] that you did or didn't know Nancy Niehaus before this date?

A: I didn't know her.

Q: And you didn't know anything about her?

A: No, sir."

When questioned on direct examination as to how Nancy Niehaus became an informant for the MEGSI unit, Boyne replied, "That's handled by my supervisor. He interviews all informants and decides who they work with." In conclusion, the State's only rebuttal witness knew nothing about either Tipton or Niehaus prior to the initial meeting at the Tipton residence. Boyne knew nothing about whether the informant had made prior requests to the defendant for cocaine, as hinted in the record:

"Q: [Prosecutor] Tell me what happened at the meeting. Where did you go and when did you go?

A: I contacted Nancy Hiehaus [*sic*] and she stated that she had a subject that could get us cocaine."

The only person who could rebut the inference to be drawn here, that is, that the informant made previous requests to the defendant to obtain cocaine while at the same time in contact with MEGSI, is the informant herself. However, the State failed to call her to explain her relationship at this point with Tipton and MEGSI.

The effect of this failure to call a rebuttal witness is well established in Illinois:

"[T]here is no question but that the government employee, or informer, Reynolds, could refute the testimony if false. While the State was not obligated to call Reynolds [citation], the unexplained failure to do so may give rise to an inference against the State." (*People v. Strong*, 21 Ill. 2d 320, 325, 172 N.E.2d 765 (1961).)

In *People v. Dollen*, the court in addressing the same issue held that "The State, for example, may have easily rebutted the defense testimony concerning the manner in which the drugs were found or the inference of their possible source by calling the informer to testify. However, it chose not to, explaining that Wright had disappeared, and simply relied upon the testimony of police officials which primarily related to the actual sale.

*  *  *

We conclude that no evidence was presented to refute defense testimony and establish beyond a reasonable doubt that defendant was not entrapped into the commission of the offense charged as in *Strong*." (53 Ill. 2d 280, 284-85, 290 N.E.2d 879.)

At the hearing in aggravation and mitigation of the sentence, the prosecutor stated that "[t]he People did not intend to call her [Nancy Niehaus] before trial, did not during the trial, form the intent to call her, and in fact, never considered Nancy Niehaus to be one of their witnesses in this case." This failure to call the paid informant may, under the rule of *Strong*, give rise to an inference against the State's case.

■ The Supreme Court in *Sherman v. United States*, 356 U.S. 369, 2 L. Ed. 2d 848, 78 S. Ct. 819 (1958), held that entrapment had been established as a matter of law:

"The case at bar illustrates an evil which the defense of entrapment is designed to overcome. The government informer entices someone attempting to avoid narcotics not only into carrying out an illegal sale but also into returning to the habit of use. Selecting the proper time, the informer then tells the government agent. The setup is accepted by the agent without even a question as to the manner in which the informer encountered the seller. Thus the Government plays on the weaknesses of an innocent party and beguiles him into committing crimes which he otherwise would not have attempted. Law enforcement does not require methods such as this." (356 U.S. 369, 376, 2 L. Ed. 2d 848, 853, 78 S. Ct. 819.)

This case is similar to the situation in *Sherman*. The defendant exhibited no predisposition to commit the crime, the relationship of the informer to the MEGSI agent was nonexistent at the time of the initial September meeting at the Tipton residence, and the conduct of the informer led the defendant into the commission of the offense which he would not have

otherwise attempted. When combined with the failure of the State to call the informer to testify at the trial of the defendant, the conclusion must be that the defense of entrapment existed as a matter of law.

On September 3, 1975, the date of this offense, the defendant was 17 years of age and just commencing his sophomore year in high school. He lived with his parents and two brothers in Granite City, Illinois. In addition to attending school he did odd jobs. He had never used drugs. He had never before sold drugs. He had never before been charged or convicted of any crime. He came from an excellent family whose mother and father tried to maintain close supervision of him and his two brothers. There can be no question, therefore, that the defendant was not predisposed to commit the crime charged.

■ The defendant testified that he attempted to purchase cocaine at the request of Nancy Niehaus, a girl he had been dating until a few weeks before this incident. He did not know that she was secretly working for the State. His testimony on this aspect of the case is undisputed and therefore must stand. (*People v. Dollen,* 53 Ill. 2d 280, 290 N.E.2d 879 (1972); *People v. Housby,* 33 Ill. App. 3d 762, 338 N.E.2d 461 (1975).) In this case the criminal design did not originate in the mind of the defendant but was conceived by his government who recruited a former girl friend to induce him to procure a drug. It has been said that the practice of inducing persons to commit crimes is distasteful at its best and intolerable at its worst. In *People v. Housby,* the court said:

> "Where the intent to perform the criminal act arises in the mind of the law enforcement officer or his agent (such as the informer), and he induced an innocent man to do the act, there has been an entrapment. Failure of the State to call Lucas to rebut the testimony, if it could be rebutted, raises a strong inference against the State. [Citations.] There is no testimony concerning any prior drug involvement on the part of Housby. As stated in the case of *People v. Dollen,* 53 Ill. 2d 280, 284, 290 N.E.2d 879:
>> ' "[T]he State must be responsible for the actions of their informer * * * when the defense of entrapment is raised." ' "
>
> 33 Ill. App. 3d 762, 764.

In *Gray v. State,* 249 Ind. 629, 231 N.E.2d 793 (1967), the supreme court of Indiana stated that there was no evidence that the defendant before he was approached by the informant had been engaged in the sale of heroin or that he had any intent to make a sale before he was asked to do so by a plan of law enforcement officers. In that case the court said:

> "Where the evidence shows, as in this case, that there was a plan devised by law enforcement officers to reveal a violation of the criminal law and such law enforcement officers participate actively in the transaction which is declared to be illegal, without further

proof the evidence shows merely that it was the scheme, the idea, and the plan which originated with law enforcement officers. There must be in such instances evidence which will rebut that the illegal transaction was induced solely by the plan of the law enforcement officers, since the burden of proof is on the State and does not shift to the defendant. The evidence must show that the illegal transaction was actually that of the appellant and not that of the law enforcement officials or informer who was acting at the instigation of the law enforcement officials." 249 Ind. 629, 633-34, 231 N.E.2d 793, 796.

In *Smith v. State,* 258 Ind. 415, 281 N.E.2d 803 (1972), the supreme court of Indiana iterated its holding in *Gray,* but went on to say:

"We, therefore, have clearly adopted or embraced a rule of law that before the State sets into operation a scheme to trap a particular suspect, there must be probable cause for the suspicions. We recognize the absolute necessity, under certain circumstances, of permitting police officers to use this method of detecting crimes and apprehending criminal suspects. The illicit drug traffic running rampant through our society today, the havoc that it is wreaking and its secretive nature and the difficulty of its detection are compelling reasons for permitting this method of criminal detection and apprehension. In view of the magnitude of this problem, it may well be in order to consider means of allowing a greater latitude of investigative procedures in such cases, provided, it can be done without endangering substantial individual rights." 258 Ind. 415, 418, 281 N.E.2d 803, 805.

Both the *Gray* and *Smith* cases were approved again by the Indiana Court of Appeals in *Reynolds v. State,* 155 Ind. App. 226, 292 N.E.2d 290 (1973).

In *People v. D'Angelo,* 401 Mich. 167, 257 N.W.2d 655 (1977), the supreme court of Michigan adopted the objective test of entrapment which focuses upon the propriety of the government conduct which resulted in the charges against the defendant instead of upon the defendant's predisposition to commit the crime charged.

"The purpose of the entrapment doctrine is to deter unlawful government activities and to preclude the implication of judicial approval of impermissible government conduct." (401 Mich. 167, 173, 257 N.W.2d 655, 658.)

However, the Michigan Supreme Court also held that the judge and not the jury should decide this issue, saying:

"The policy considerations which moved us to adopt the objective test of entrapment compel with equal force the conclusion that the judge and not the jury must determine its

existence. The thesis is that law enforcement conduct which essentially manufactures crime is a corruptive use of governmental authority which, when used to obtain a conviction, taints the judiciary which tolerates its use. It is a practice which relies for its success upon judicial indifference, if not approval, and it must be deterred. Its deterrence is a duty which transcends the determination of guilt or innocence in a given case and stands ultimately as the responsibility of an incorruptible judiciary.

As Mr. Justice Roberts pointed out in *Sorrells*:

'The protection of its own functions and the preservation of the purity of its own temple belongs only to the court. It is the province of the court and of the court alone to protect itself and the government from such prostitution of the criminal law.' 287 U.S. at 457, 53 S. Ct. at 218. (Concurring opinion)

Aside from the forceful policy considerations which dictate judicial vigilance in guarding against and precluding the use of improper law enforcement tactics in the judicial process, there are pragmatic reasons why the duty should not be passed along to the jury.

A jury verdict of guilty provides no evaluation of the challenged police conduct in the case and gives no guidance by which to measure the propriety of future official conduct. Similarly, a verdict of not guilty fails to disclose whether the police conduct challenged in the case was found to be impermissible or that the prosecution simply failed to prove the defendant's guilt beyond a reasonable doubt.

Resolution of the entrapment issue by the court, on the other hand, will provide, through an accumulation of cases, a body of precedent which will stand as a point of reference both for law enforcement officials and the courts. Where jury determination thwarts the rationale of the defense, judicial determination results in the formulation of appropriate standards of conduct.

Moreover, the concern expressed by the United States Supreme Court in *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964), and this Court in *People v. Walker* (On Rehearing), 374 Mich. 331, 132 N.W.2d 87 (1965), that evidence pertaining to guilt is likely to infect a jury determination of the voluntariness of a confession has an equal and analogous application to jury determination of entrapment.

Just as in the determination of the voluntariness of an alleged confession, determination by the trial court of the entrapment issue will insure that the jury's verdict is free from the taint of undue and

unnecessary prejudice which might well be generated by the concomitant duty to decide voluntariness in the confession case or the propriety of police conduct in the entrapment case.

In sum, we share the view expressed by Judge O'Hara who, in the concurring portion of his separate opinion in the Court below wrote:

> '[I]t is beyond human mental limitations to allow a jury to hear evidence clearly establishing the corpus delicti of a given offense and at the same time charge that if entrapment occurred this evidence is to be disregarded by them.' " (401 Mich. 167, 173-76, 257 N.W.2d 655, 658-59.)

For other States adopting the objective test of entrapment, see *State v. Mullen*, 216 N.W.2d 375 (Iowa 1974); *State v. Sainz*, 84 N.M. 259, 501 P.2d 1247 (1972); *Grossman v. State*, 457 P.2d 226 (Alas. 1969); *People v. Benford*, 53 Cal. 2d 1, 345 P.2d 928 (1959). See also K. Murchison, *The Entrapment Defense in Federal Courts: Modern Developments*, 47 Miss. L.J. 573 (1976).

In *Love v. People*, 160 Ill. 501 (1896), a defendant was prosecuted for a burglary in which he was induced to participate by a detective employed for the purpose of ferreting out lawlessness in the city of Momence. The detective planned the crime and with the consent of the owner of an office arranged for the safe therein to be burglarized and some money taken. The detective suggested the crime and induced the defendant to participate in it. The supreme court said, "To stimulate unlawful intentions for the purpose and with the motive of bringing them to maturity so the consequent crime may be punished, is a dangerous practice." (160 Ill. 501, 508.) The court went on to say at page 505:

> "Such means and agents are more dangerous to the welfare of society than are the crimes they were intended to detect and the criminals they were to arrest."

For the foregoing reasons the judgment of the circuit court of Madison County is reversed.

Reversed.

KARNS, J., concurs.

Mr. JUSTICE JONES, dissenting:

Whether entrapment exists is ordinarily a question reserved for the jury and should not be disturbed on appeal unless the reviewing court concludes that entrapment exists as a matter of law. (*People v. Andreano*, 64 Ill. App. 3d 551, 381 N.E.2d 783 (1978); *People v. Cooper*, 17 Ill. App. 3d 934, 308 N.E.2d 815 (1974).) In this case the jury, under proper

instructions, found that there was no entrapment and that finding was confirmed by the trial court. The majority has, in its turn, found that there was entrapment as a matter of law. With that finding I disagree and consequently respectfully dissent.

In finding entrapment as a matter of law the majority has failed to consider or weigh certain matters in evidence which the jury and the trial court had before them, matters which I feel preclude a finding of entrapment as a matter of law.

The majority portrays the defendant as a shy, innocent youth who was made the prey of devious, overreaching agents of MEGSI. The evidence shows, however, that the characterizations should be inverted; the defendant was shown by the evidence to be predisposed to commit the offense and the agents but afforded him the opportunity.

The majority recites that Agent Boyne testified that at his first meeting with defendant a "general conversation" ensued. In fact his testimony was that a "general *drug* conversation" ensued. It is easily inferred from this that the defendant indicated he was familiar with illicit drugs and their use.

The majority overlooked or discounted the fact that *during the first meeting* between the agents and defendant, the defendant made two or three calls in an endeavor to reach a source for the requested drugs but was unsuccessful in making contact. This fact demonstrates that defendant was not hesitant in moving upon a request for illicit drugs and that persuasion and cajoling were unnecessary. Contact was made and the source produced just two days after the first meeting.

The majority completely omitted any reference to the testimony of Steve Jones, the drug source in this case, that on one other occasion the defendant had brought a person other than Boyne to him to purchase drugs.

The majority has also chosen to discard the testimony of Agent Boyne that on a subsequent occasion he again contacted defendant and arranged another drug purchase from Steve Jones. In the absence of any Illinois authority on the question the majority relies upon the Federal case of *United States v. Daniels.* I believe the authority is not apt, for the *Daniels* court relied upon Rule 403 of the Federal Rules of Evidence. That rule provides:

> "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Professor Saltzburg, in his Federal Rules of Evidence Manual (2d ed.), at page 115, comments upon Rule 403: "The rule is one of exclusion of

otherwise admissible evidence. It is a rule upon which counsel can rely to urge exclusion of almost any type of evidence."

In my opinion the trial court indulged in a proper exercise of its discretion in admitting the evidence of the subsequent offense in this case and this court should not overturn it.

In prosecutions for offenses involving narcotics the general rule is that evidence of other offenses is admissible only where it is part of the *res gestae,* or where it helps to disclose motive, intent, premeditation, guilty knowledge, malice or common plan or scheme. (*People v. Lewerenz,* 24 Ill. 2d 295, 181 N.E.2d 99 (1962); *People v. McMillan,* 130 Ill. App. 2d 633, 264 N.E.2d 554 (1970); *People v. Shaw,* 89 Ill. App. 2d 285, 233 N.E.2d 73 (1967).) However, such evidence is inadmissible where its only purpose is to show the propensity on the part of the defendant to commit this type of crime. *People v. Stadtman,* 59 Ill. 2d 229, 319 N.E.2d 813 (1974); *People v. Palmer,* 47 Ill. 2d 289, 265 N.E.2d 627 (1970).

The majority correctly states that when the defense of entrapment is raised the substantive issue becomes whether defendant was predisposed to commit the offense or whether he was incited or induced by the government into committing an offense which he would not otherwise have committed. They then argue that the very nature of the predisposition exception mandates that the proof be limited to prior offenses.

It must be conceded that there is a surface repugnancy to the notion that a subsequent act can be utilized to show a predisposition to commit a crime. However, the mere fact that the other offense was subsequent rather than prior does not mean, or even indicate, that the disposition to commit the offense was also subsequently acquired. The commission of the subsequent similar offense shows a disposition to engage in sales of illicit drugs. Although standing alone the subsequent offense does not speak to the question of *when* the defendant acquired such disposition, it is evidence that defendant is possessed of a particular character trait, and absent some indication that such trait, or disposition, was in fact acquired subsequent to the offense charged, it should be considered. This is particularly true where, as here, the subsequent offense occurs a short time after the prior offense in this case, just one month.

In *United States v. Warren,* 453 F.2d 738 (2d cir. 1972), *cert. denied* (1972), 406 U.S. 944, 32 L. Ed. 2d 331, 92 S. Ct. 2040, a Federal court considered and approved the use of a defendant's subsequent criminal activity to negate the entrapment defense. The defendant, who was charged with conspiracy, argued that he had been prejudiced by the introduction into evidence of drugs which had been seized from his home after the conspiracy had ended. The court held that the drugs were properly admitted into evidence to rebut the defendant's claim of

entrapment. It is to be noted that the decision in the *Warren* case was rendered prior to the adoption of Rule 403 of the Federal Rules of Evidence under rules that govern decisions in Illinois courts.

The majority recites testimony of Agent Boyne that he never received any drugs from defendant as indicating that defendant was not predisposed. Such recital seems specious since defendant was charged and convicted only with being an accessory.

The defendant argued, and the majority has now found, that he was insecure and lacking in confidence and that his need for the approval and companionship of the opposite sex was exploited by the State to induce him to perform a criminal act he would not otherwise have performed. However, defendant did not testify that Niehaus promised him dates, sexual favors or even friendship in return for his help. The court encountered a similar situation in *People v. Washington*, 81 Ill. App. 2d 162, 225 N.E.2d 673 (1967), and found that an appeal of the type made by Niehaus was not sufficient to establish as a matter of law that a defendant was entrapped. In a similar vein, it is held that a defendant's initial or temporary reluctance to enter into a narcotics transaction is not determinative of entrapment. (*People v. McSmith*, 23 Ill. 2d 87, 178 N.E.2d 641 (1961).) Also, the fact that a defendant has no prior criminal record is a factor to be considered on the entrapment issue, but the fact of no prior conviction is not sufficient standing alone to show that the defendant was entrapped. *People v. Andreano*; *People v. Cooper.*

For the foregoing reasons I would find the defendant's predisposition has been established and that the People have proved beyond a reasonable doubt that defendant was not entrapped and affirm the judgment of the trial court.