THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
PAUL D'ANGELO, Defendant-Appellant.

Fifth District   No. 5—90—0762

Opinion filed January 17, 1992.

William A. Schroeder and Darrell Dunham, both of Carbondale, and Brocton Lockwood, of Marion, for appellant.

Charles Garnati, State's Attorney, of Marion (Kenneth R. Boyle, Stephen E. Norris, and Scott A. Manuel, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE WELCH delivered the opinion of the court:

On June 3, 1988, defendant, Paul D. D'Angelo, was charged in a three-count information with the offenses of unlawful possession with intent to deliver controlled substances (more than 15 grams of cocaine), unlawful possession of a controlled substance (more than 15 grams of cocaine) and solicitation to commit burglary. Defendant raised the defense of entrapment. He was tried before the court sitting without a jury and was found guilty on all three counts. On November 14, 1990, defendant was sentenced to serve six years'

imprisonment for unlawful possession with intent to deliver controlled substances, concurrent with three years' imprisonment for solicitation to commit burglary. The defendant was also ordered to pay a fine of $1,000. Defendant appeals his conviction for unlawful possession with intent to deliver, arguing that the State failed to prove beyond a reasonable doubt that defendant was not entrapped. Defendant also appeals his sentence for unlawful possession with intent to deliver, arguing that a mandatory prison sentence of six years violates his Federal constitutional right not to be subjected to cruel and unusual punishment and his State constitutional right to be subjected to proportional sentencing.

Defendant's bench trial began on September 5, 1990, before the circuit court of Williamson County. Prior to the commencement of trial, defendant stipulated to the factual basis for the charge of solicitation and stated that he was not contesting that charge. Defendant agreed that the State need not present any evidence on the charge of solicitation and the defendant stipulated that there were sufficient facts upon which to find him guilty.

The State's first witness was Gene Coombs, a special agent for the Department of Treasury, Bureau of Alcohol, Tobacco and Firearms. Coombs had been contacted by an agent of the Illinois State Police about an individual who was allegedly interested in smuggling firearms inside Menard State Prison. Coombs was interested because it was assumed that the firearms were stolen. Coombs was not initially interested in any narcotics violations and at the beginning of the investigation had no intention of inducing defendant to smuggle narcotics into the prison. The subject of Coombs' investigation was the defendant.

Coombs was informed that an inmate inside the prison was going to provide defendant with a telephone number which was actually an undercover police line. The inmate's nickname was "Grunt." Coombs never met or spoke with Grunt. Defendant was supposed to call the undercover line on April 18, 1988. Coombs would be posing as a "biker" type nicknamed "Bones" who was interested in buying the firearms which defendant had been unable to smuggle into the prison.

On April 18, 1988, defendant did, in fact, call the undercover police line. The phone conversation was tape-recorded. Coombs and defendant discussed the guns which defendant had for sale. Defendant told Coombs the firearms were stolen. They agreed to meet at the McDonald's parking lot in Carbondale. Defendant was employed at Menard State Prison at the time. During this initial phone con-

versation, defendant alluded to the possibility that he and Coombs might be able to engage in business whereby defendant would take "stuff" into the prison. Defendant wanted to meet Coombs first and get to know him. Coombs did not broach this subject. Defendant had learned Coombs' undercover telephone number from Grunt.

Coombs and defendant met at the McDonald's in Carbondale on April 22, 1988, pursuant to their phone conversation. Also present was Brenda Taylor, an agent with the Illinois State Police, who was posing as Bones' wife "Patti." This meeting was tape-recorded and video-recorded. Upon meeting, Agent Taylor patted defendant down for a weapon and a body wire. Defendant produced some weapons from the trunk of his car. They were in a brown paper bag. One of the guns had the serial number ground off of it. Defendant explained how this had been done. At this meeting, Coombs inquired of defendant whether he could act as a narcotics pipeline into Menard. Defendant had described to Coombs how he had planned to smuggle guns into Menard. Defendant had also told Coombs that he had previously smuggled shivs, or homemade knives, and razors into Menard. Defendant told Coombs that he did not use cocaine, but that he did occasionally use heroin and Dilaudid. Defendant emphasized that there was a market for drugs inside the prison.

Coombs purchased the weapons from defendant. Defendant told Coombs that his brother was involved in the transaction in some way. Coombs and defendant agreed to meet again in order to sell more firearms. Coombs gave defendant another undercover phone number. Defendant did not want to be contacted by Coombs because his wife was unaware of his activities.

Defendant had told Coombs that he was previously the principal of a parochial school and that he had had only one arrest at a young age. Defendant stated that no one would suspect him of anything because he looked so clean cut.

The next contact Coombs had with defendant was on May 6, 1988, when Coombs telephoned defendant. Defendant was somewhat surprised to hear from Coombs. Coombs told defendant that he wanted to give him a beeper number and see if defendant had any more firearms for sale. This conversation was tape-recorded.

Coombs again telephoned defendant on May 20, 1988. This conversation was also tape-recorded. Coombs told defendant he was interested in purchasing more firearms. Coombs wanted to keep in contact with defendant to learn as quickly as possible whether defendant was, in fact, smuggling guns or drugs into Menard.

Coombs called defendant again on May 23, 1988. This conversation was tape-recorded. Coombs called defendant on May 31, 1988, and this conversation was tape-recorded. The purpose of this conversation was to make arrangements to meet with defendant. They arranged to meet at the Burger King in Marion on June 2, 1988.

Coombs and Agent Taylor met with defendant on June 2, 1988. The meeting was tape-recorded. Upon meeting at the Burger King, they decided to move the location of the meeting to the nearby Holiday Inn because there had been recent law enforcement activities in the vicinity of the Burger King. Present in the hotel room were Coombs, Taylor and defendant. This meeting was tape-recorded. The three discussed weapons and narcotics. Taylor produced cocaine and gave it to defendant to smuggle into Menard. Defendant had told Coombs that he and his brother had occasionally used heroin together and defendant used Dilaudid. Defendant repeatedly asked Coombs if he could supply defendant with Dilaudid. Defendant asked to be paid $200 for taking the cocaine into Menard. Coombs and defendant haggled over the price. Defendant described the procedure whereby he would smuggle the cocaine into Menard. Defendant would hide the cocaine in his groin area inside a baggie. Defendant also explained that he might leave the cocaine in his vehicle when he arrived at the prison, enter the prison to be sure there were no drug dogs present, and then return to the car for the cocaine. Coombs had the impression that defendant had smuggled items into the prison before. Defendant was aware that if he was caught with the cocaine, it would constitute a Class X felony.

Defendant had shown interest in obtaining a fully automatic weapon. Defendant provided Coombs with information regarding a doctor's office. Coombs was to burglarize the office and in return for the information, Coombs would provide defendant with a machine gun. Defendant's wife was employed by the doctor and defendant was familiar with the hours the office was open and the burglary alarm system. Defendant also provided Coombs with a key to the office. The idea of the burglary originated with defendant.

Defendant was arrested on June 2, 1988, following the meeting at the Holiday Inn.

On cross-examination, Coombs explained that he felt defendant was predisposed to commit the crime of smuggling drugs into Menard because defendant had told him that he had previously smuggled other contraband into the prison. However, Coombs had never independently established that this was true. Coombs did not believe that any of the weapons which defendant sold to him were

stolen. However, the first guns which Coombs bought, although legally owned by defendant, had been reported by defendant to have been stolen from his residence. Coombs acknowledged that defendant only called him once, the initial contact on April 18, 1988. After every conversation Coombs told defendant to call him. Defendant never did. Coombs called defendant every time. Coombs also acknowledged that on one occasion defendant gave him a number at which to call him. The area code was wrong, but the number was correct.

At this point the audiotapes and videotapes of the conversations and meetings between defendant and Coombs and Taylor were played for the court. On April 18, 1988, defendant telephoned Coombs. Defendant stated that he was a friend of Grunt's who had some "pieces" and perhaps they could do some business. Defendant described three weapons to Coombs which defendant wanted to sell for $1,100. Defendant wanted the money in denominations of $50 and $100 bills. Defendant and Coombs agreed to meet in Carbondale at 11 a.m. on April 22, 1988, at the McDonald's parking lot. Coombs told defendant that he had talked with Grunt and Grunt had said something about trying to get the "poppers inside the walls there." Defendant responded that Grunt had mentioned that. Defendant stated that he had been told by "B.J.," a friend of Grunt's, that it would not be safe to bring the guns into the prison. B.J. advised that he would find someone "on the outside." Defendant said that Grunt had mentioned that Coombs might want to do some other type of business with some other things later on inside the walls. Defendant stated that they would talk about it when they got together. Coombs stated that he would like to get some things inside the walls. Defendant stated that Grunt had mentioned this and that they could work something out when they got together. Defendant refused to give Coombs his home telephone number. Coombs asked if defendant had any other weapons. Defendant said not at that time, but that he might have some more in the future. Defendant stated that he was unable to get fully automatic weapons and that Grunt had mentioned that Coombs might be able to get some fully automatic weapons.

The videotape of the meeting of April 22, 1988, between defendant, Coombs and Taylor was played for the court. Defendant delivered the guns to Coombs and explained how the serial numbers could be removed from them. Defendant told Coombs that Grunt had mentioned that in the future he might want to get "an ounce" in the prison. Taylor asked how defendant would get it in and

defendant explained that he had never brought in drugs before but that he would hide the drugs in his pants. He stated that he would not be patted down or searched and that he was not worried about drug dogs. Defendant stated that he did not even "get high" but that he did occasionally take Dilaudid with his brother. Defendant stated that Grunt wanted "smoke" not "coke." Defendant offered to bring the ounce into the prison and Grunt would sell it within the prison. Defendant also explained how he would have smuggled the guns in. He stated that he would have smuggled them in in pieces. He knew all the hiding places for the parts in the building. Defendant told Coombs and Taylor to think about the drugs, that he would have Grunt call Coombs to discuss it further. Coombs stated that he was leery of drugs and preferred dealing in guns. Taylor asked defendant whether she could contact defendant regarding the drug deal. Defendant told her not to call him at home because his wife did not know of his activities. Coombs gave defendant a phone number where he could be reached. Coombs asked defendant whether he would be getting any more guns. Defendant stated that he might be able to get some more revolvers from his brother. Defendant stated that this was his first "deal" in 12 years. Defendant told Coombs that Grunt had said that Coombs might be able to get defendant a fully automatic weapon. Defendant again stated that he would talk to Grunt about the smoke. Defendant stated that he had been imprisoned when he was 16 or 17 years of age and did not want to go back. Defendant stated that he had a good life and he was very careful. Coombs told defendant to call. Defendant again stated that Grunt wanted some reefer but that defendant did not smoke reefer. Defendant told Coombs that he would call. Defendant stated that he only did Dilaudids and "junk." Defendant then asked Coombs if he could obtain any Dilaudid. Coombs responded that he might be able to get some. Defendant stated that he did not have any drug connections. Defendant got the guns from his brother. Defendant and his brother got together occasionally and went on "heroin holidays" for a weekend. They injected heroin intraveneously. Coombs asked defendant for more guns. He asked defendant what kind of machine gun defendant wanted and defendant told him. Defendant told Coombs that he used to be a principal at a religious school but that he has conservative libertarian views regarding gun laws. Defendant stated that he was involved in conservative politics. Taylor again asked defendant if it was difficult to get drugs into Menard. Defendant stated that it was not difficult for him, especially if it was heroin or cocaine, which came in small

packages. He said that he would put reefer in a bag and hide it in his crotch. Coombs asked defendant if he was serious about smuggling in the drugs. Defendant stated that he was serious. He said that he had never brought in drugs before but that he could do it and he would do it. He had brought in other things such as shanks. However, he would only bring in drugs two times a month. Defendant told Coombs that he had asked B.J. about the pistols. B.J. talked to Grunt and then told defendant to talk directly to Grunt. Defendant described the types of knives he had smuggled into the prison. He stated that he smuggled these in as a favor to certain inmates. Coombs asked defendant what there was a market for in the prison. Defendant responded, "drugs, drugs, drugs," specifically reefer and coke. Defendant said that he would deliver the drugs to Grunt and Grunt would sell them in the prison. Defendant said he was doing this for money, the "profit motive," and that he was a capitalist. Defendant said that if Coombs knew someone in the general population at the prison who was trustworthy, Coombs could have that person contact defendant. Defendant again mentioned how easy it was to get drugs into Menard. Defendant told Coombs that he might not call him for a couple weeks or a month but that he would talk to Grunt about the reefer. Coombs told defendant to call.

The tape recording of the phone conversation of May 6, 1988, was played. Coombs called defendant and asked him if he had been trying to get in touch with him. Defendant responded that he had not. Coombs gave defendant a beeper number. Defendant asked Coombs if he had been pleased with the guns. Defendant asked if Coombs had made any arrangements with Grunt to get something into the prison. Coombs said no. Coombs said he was looking for more guns. Defendant said he might have some more in three or four weeks after he talked to his brother. Defendant thought he might have one to four guns at that time. Coombs then reminded defendant that defendant had expressed interest in a machine gun and asked defendant if he would swap a machine gun for some cocaine. Defendant responded that that might be possible. Defendant suggested that they get together and talk. Defendant said he would call Coombs in two to three weeks.

The tape recording of the phone conversation between Coombs and defendant on May 20, 1988, was played. Again, Coombs telephoned defendant. Defendant said he had been planning to call Coombs that evening. Coombs told defendant he had found an MP5 fully automatic weapon. The owner of the gun was willing to trade

it for cocaine. The weapon was "a little bit warm." The owner wanted an ounce of cocaine. Defendant's brother was going to be coming to town in a week or so and then would be going "down south." Defendant would talk to his brother about getting some cocaine. Defendant stated that he did not have drug connections and needed to go through his brother. Defendant told Coombs to call him in a few days after defendant had talked to his brother. Defendant gave Coombs a number for a Carbondale pay phone and they agreed that Coombs would call Monday evening at 10. The telephone number had a 312 area code. Defendant said his brother would also have one to four weapons for sale by Monday. Coombs asked defendant if he was serious about wanting the MP5. Defendant stated that he seriously wanted the gun but it depended on whether his brother could get some cocaine. Defendant then stated that if Coombs wanted to get something inside the walls, they could work something out. Defendant stated that he had no connections at all with cocaine but that his brother did. However, his brother may not be interested. Coombs asked defendant what the price of a couple grams of cocaine would be. Defendant responded that he did not know, he had not dealt with drugs in a decade, and he would have to talk with his brother. Coombs asked defendant if he could get just a couple grams of cocaine so the owner of the gun would hold it. Defendant responded that he would have to check with his brother. Defendant asked if the gun owner would accept cash. Coombs said he would want at least $2,000 for it. Coombs agreed to call defendant Monday evening. Defendant said that if his brother could get the cocaine, he would trade it for the MP5. Defendant then asked Coombs if he could get him some Dilaudids, just a few so that he could "do" them with his brother. Defendant then mentioned that he wanted to talk with Coombs about another deal involving computers that might be profitable for both of them. It involved getting into a physician's office.

The tape of a telephone conversation between Coombs and defendant on May 23, 1988, Monday evening, was then played. Coombs called defendant. Defendant immediately told Coombs that he had talked with his brother and his brother did not want to get involved with drugs. His brother does coke and can get it but does not want to get involved. Defendant would like to buy the MP5 but could not come up with $2,000. Defendant then told Coombs that his brother was bringing him two to four guns which defendant would have for sale by next Tuesday evening. Coombs asked defendant if there was any chance on the drugs. Defendant said his

brother was definite that he did not want to get involved. Defendant tried to talk him into it but his brother refused. Defendant asked Coombs about the MP5 and told Coombs he would really like to have it but could not come up with the money. Defendant described the two guns he would have for sale and a price of $900 for the two guns. Coombs asked if both guns were "hot," and defendant responded that they were. Defendant told Coombs to call him the next Tuesday at the same time and same number. Coombs then asked defendant about the physician's office deal. Defendant explained that he had the code to a burglar alarm system, the key to the door and layout of a physician's office which Coombs could burglarize. Defendant did not want to be involved in the burglary but would trade the information for money. The office contained computers, syringes, medical equipment, lab equipment, expensive furniture and artwork. Defendant knew the hours of work and the cleaning people's schedule. Defendant had the information, and Coombs had the connections to sell the stolen goods. They agreed to discuss it further. Defendant offered to get photographs of the interior. They agreed that Coombs would call defendant on Tuesday. They would arrange a meeting. Coombs told defendant that he had given him the wrong area code. Defendant apologized and said that he must not have been thinking when he gave him the number. Defendant then said that Grunt wanted to know if Coombs was interested in getting anything inside the prison. Defendant told Coombs to think about it and let him know. Coombs told defendant to stall Grunt. Grunt had been wanting defendant to bring some reefer in.

Dr. Paul Bennett was called to testify. He testified that he is a physician in Carbondale who had previously employed defendant's wife, Lynn D'Angelo. Mrs. D'Angelo was dismissed from her employment when Bennett learned of defendant's plan to burglarize his office.

The tape recording of the telephone conversation between Coombs and defendant of May 31, 1988, was played for the court. Defendant stated that he was ready to do business. He stated that he had one more "piece of equipment" Coombs might be interested in and described a shotgun. All three guns would sell for $1,300. Coombs agreed to look at the shotgun. They agreed to meet on Thursday in Marion at the Burger King. Coombs then asked defendant about the burglary at the physician's office. Defendant told Coombs he would give him all the information he needed in return for the MP5. Defendant assured Coombs that he would make a

great deal of money if Coombs had connections to sell the stolen goods. They discussed some of what defendant would provide Coombs, such as the burglar alarm code and the key to the office. Coombs told defendant that he was going to commit the burglary that weekend. Defendant did not object. Defendant stated that he wanted the MP5 very much. Coombs then asked defendant if he could help Coombs get an ounce of cocaine inside the prison to Grunt. Defendant stated that he had no problem getting it in. Defendant stated that he would do that for Coombs. Coombs asked defendant what it would cost. Defendant stated that he had not thought about it but he would consider it and tell Coombs later what it would cost. Defendant assured Coombs that he would do it. Coombs told defendant that he was serious, and defendant assured Coombs that he was too. Defendant told Coombs that he did not do cocaine, although he did do Dilaudid and heroin occasionally. Defendant explained different ways in which Grunt could get money out to Coombs after he sold the cocaine inside the prison. Coombs said that Grunt could give defendant the money and defendant could bring the money out. Defendant stated that he would only transfer drugs to Grunt and no one else would know about it. Defendant stated that there was a lot of money to be made on drugs in the prison. Coombs agreed to bring the cocaine on Thursday when they met. Defendant stated that he would like some cash but he would take 100 Dilaudids. Coombs again asked defendant what it would cost to get the cocaine inside the prison. Defendant stated that he did not know what to charge. He thought $200 would be reasonable. Coombs suggested $100 and defendant insisted on $200. Coombs agreed. Defendant reminded him that he was taking a big risk and that he would not take any of the cocaine for his own use. Defendant asked Coombs if he would pay him up front for smuggling the cocaine, and Coombs told him he would. They agreed to meet on Thursday.

The tape of the meeting of June 2, 1988, between Coombs, Taylor and defendant was played for the court. They met at the Burger King as agreed and discussed the fact that several people had been arrested recently at the Burger King. They agreed to move to a room at the nearby Holiday Inn. Once there Coombs examined the guns defendant had brought and they discussed them. At one point defendant left to check the parking lot for police. Defendant stated that he was paranoid about the police and that if he left the room without any dope he would not feel bad. Defendant also reduced the price of the three guns from $1,300 to $1,100 because he did not

want to leave with a shotgun in his car. Coombs paid $900 for two of the guns and said he would think about the shotgun. Coombs then brought up the burglary of the physician's office. Defendant asked Coombs if he would agree to give him the MP5 in return. Coombs agreed. When Taylor asked how defendant came by his information, he responded that his wife worked there. Defendant assured them that his wife knew nothing about this. Defendant asked for specifics on the MP5 to be sure it was what he wanted. Defendant gave Coombs a key, the alarm code and details on how the alarm worked. Coombs would have 20 seconds in which to enter the alarm code after entering the building. Defendant told them what door to enter and where the alarm was located. Defendant had typed up all the information for Coombs. They discussed the information at length. Coombs then asked defendant whether the guns he had purchased were stolen. Defendant responded that they were stolen but they had never been used in a crime. Defendant asked Coombs whether he wanted the shotgun. When Coombs hesitated, defendant stated that he was scared to death and did not want to leave the hotel room with it. Taylor then stated that they needed to talk about the cocaine. Defendant stated, "Oh, you did get it. Oh shoot." He then laughed. Defendant said, "You just tell me what you want to do." Taylor told him to just get the cocaine inside and give it to Grunt, but she wanted to know how he was going to do it because she had a lot of money invested. Defendant then asked that someone look outside because he was scared to death. Coombs reported that it was quiet. Defendant stated that he had discussed this deal with Grunt. Grunt told him that he had someone who would buy all the cocaine for a lump sum and Grunt would give defendant the money to give to Coombs. Taylor asked how he would get the cocaine inside. Defendant explained that he would hide it in his groin and take it in the next day. Defendant did not think there would be any drug dogs at the front gate. Grunt had told him that if there was a problem he would let him know. Defendant said he might leave the cocaine in his car and enter the prison to check for dogs and then if it was safe, return to his car and get the cocaine. Defendant did not believe he would be searched. If defendant felt it was unsafe he would not try to get it in. Taylor then gave defendant the cocaine. Defendant told them that Grunt had told him that he would sell the entire amount to someone in the prison for a lump sum. Grunt was also going to pay defendant $200 for bringing the cocaine in. Taylor then gave defendant $200. Defendant said he would do it Friday or Monday. Defendant stated that he was very

happy to be making $400. Coombs stated that he had money in his car with which he would purchase the shotgun. Defendant apologized for being so nervous but explained that the recent arrests in the area had made him so. Defendant explained that he was going to take the cocaine to the university where he was a student and put it in his locker. Defendant again inquired about the MP5. Taylor indicated she was nervous about her cocaine, and Coombs told her to settle down and lighten up. He told defendant that she was nervous. As defendant left the hotel room he was arrested.

Brent Nausley was called to testify for the State. He had been a police officer in DeSoto, where defendant resided. He had investigated a burglary at defendant's residence in which three handguns had been stolen in August 1987. After that burglary, defendant never reported to the police that the stolen guns had been recovered by him. At approximately the same time as the burglary, defendant had some other problems such as vandalism and credit cards stolen from his mailbox.

Carl Thomas Caraway, a correctional lieutenant at Menard Correctional Center, testified that he was involved in the investigation of defendant. Defendant had been employed by Menard in June 1988. An inmate known as Grunt approached Caraway and told him that defendant wanted to sell some guns inside the prison. Grunt told Caraway that another inmate, B.J., had told Grunt that defendant wanted to sell three handguns to B.J. B.J. did not have the cash to purchase the guns so he went to Grunt to see if he could help him out. Grunt then reported it to Caraway. Grunt knew that having handguns inside the prison would be very dangerous. Caraway contacted the Springfield office and gained the assistance of Investigator Dave Brubaker. Caraway described the security system at the prison to prevent contraband from being brought in. Employees do not have to go through a metal detector. Spot body-pat searches are conducted on employees on a random basis. Defendant could possibly get into the school building without being searched at all. Employees can also leave the building during their shift and return. Caraway did not know defendant or have any feelings toward him when Grunt came to him. The warden instructed Caraway to contact Springfield. Brubaker came to Menard and talked with Grunt. The prison reassigned Grunt so that he would be working as a janitor in the school building with defendant. Brubaker wanted to learn more about the weapons defendant wanted to sell. Brubaker and Caraway never discussed drugs with Grunt. Grunt was never told to bring up the subject of drugs to defendant. Caraway was

not aware that anyone at Menard or in the administration at Menard had any grudge against defendant. Caraway was not aware that defendant had been writing letters to the warden at Menard and to the director of corrections in Springfield complaining about conditions and the administration at Menard.

David Brubaker, an internal security investigator with the Illinois Department of Corrections, testified that he was involved in the investigation of defendant. He was told by Caraway that Caraway had received information from Grunt that defendant, a teacher at Menard, had offered to sell three guns to an inmate, B.J. B.J. had not had the money to purchase the weapons and asked Grunt for help. Brubaker was never instructed by the warden at Menard or the Director of the Department of Corrections on how to conduct the investigation. Brubaker interviewed Grunt, who confirmed what he had been told by Caraway. Grunt had talked with defendant and told defendant that while he did not have the resources to purchase the guns himself, he knew someone on the street who would be able to purchase the weapons. It was arranged for Gene Coombs to pose as "Bones," who would act as Grunt's contact on the street. Brubaker gave Grunt a telephone number to give to defendant which was to be Bones' telephone number. Brubaker's main goal was to prevent the guns from being brought into the prison. Brubaker was involved in defendant's arrest. Following his arrest, defendant told Brubaker that he was guilty and was willing to cooperate in the investigation.

On cross-examination, Brubaker testified that he was aware that Grunt was serving a 40-year sentence for murder and that he had had previous convictions. Brubaker was not aware that Grunt had been seeking transfer to a different correctional center. Grunt was transferred for his own safety since he had acted as an informant.

Gary Catto, special agent with the Illinois State Police, testified that he was involved in the investigation of defendant. He was first contacted by Brubaker and received no instructions from the warden at Menard or from the Director of the Department of Corrections. He provided Brubaker with the undercover telephone number which was given to defendant by Grunt in order to arrange contact between defendant and Bones. Catto never had any contact with Grunt. Catto was also involved in defendant's arrest. On cross-examination, Catto admitted that he had never independently established that defendant was previously involved in selling or buying drugs, nor did Catto ever "check out" Grunt.

Special Agent Brenda Taylor, with the Illinois State Police, who acted as Bones' girl friend, testified regarding her meeting with defendant and Coombs on April 22, 1988. Defendant first raised the subject of drugs by mentioning that Grunt had suggested that defendant bring into the prison an ounce of marijuana. Prior to defendant raising the subject, nothing had been said about drugs. Taylor and Coombs were surprised. During that meeting defendant described in great detail how he would be able to smuggle drugs into Menard. Taylor never had any contact with Grunt. Defendant also told Taylor at this meeting that he occasionally took Dilaudids with his brother. Taylor also met with defendant and Coombs on June 2, 1988. Defendant seemed fairly knowledgeable about smuggling drugs into the prison. He seemed very confident that he knew exactly how it could be done. Defendant did not seem concerned about getting caught. He was aware that the offense was a Class X felony.

David Lee Pauley, the inmate known as Grunt, was called to testify. In 1988 he was serving a 40-year sentence at Menard Correctional Center for murder. In April 1988 he was housed in protective custody at Menard because a gang of prisoners was trying to kill him. He was familiar with defendant prior to April 1988. He had no negative feelings toward defendant. Grunt was informed about defendant's intention to sell guns inside the prison by B.J. because B.J. thought Grunt might have the resources or connections to buy the pistols. Upon learning from B.J. that defendant wanted to sell guns inside the prison, Grunt decided that such a situation would be too dangerous and reported defendant's intention to the prison authorities. The prison authorities asked Grunt if he would be willing to talk to defendant to determine if defendant was serious. Grunt agreed. Grunt did not ask for any special treatment in return and that was not his motivation. He was simply worried about the danger of handguns in the institution. Grunt was given a job in the part of the prison where defendant worked. Grunt was introduced to defendant by B.J., and they discussed the guns. Defendant told Grunt that he wanted money for the guns and that he would bring them to Grunt or anyone Grunt named inside the prison. Defendant wanted $1,500 for the three guns. Grunt thought defendant said he had two automatic pistols and a revolver. Grunt told defendant he would let him know. Grunt then went back to the prison authorities and told them that defendant was serious. Grunt was given a phone number to pass on to defendant. The phone number was supposed to belong to someone Grunt knew on the

street who would purchase the guns. The purpose was to prevent the guns from being sold inside the prison. Grunt did pass the phone number on to defendant. Later, defendant told Grunt that he had talked with Bones and had arranged a meeting. Defendant also told Grunt after the meeting that things had gone smoothly. Grunt testified that defendant asked Grunt if there was anything Grunt needed. Grunt responded "no," and defendant replied that he would talk to some people and maybe he could get Grunt some drugs. This was after defendant's first meeting with Bones. Grunt had never asked defendant to bring in any drugs. Defendant did eventually bring Grunt a package of marijuana. Defendant asked Grunt what the package was worth. Defendant seemed interested in the idea of selling drugs in prison. Grunt did not create this interest. Grunt sold the marijuana. Defendant smuggled the marijuana in by hiding it behind his testicles. Defendant told Grunt that he and his brother used to shoot heroin together and take Dilaudid pills. Grunt had never been told by the authorities to induce defendant to bring drugs into the prison. Defendant was the first person to mention drugs. Grunt never received any favorable treatment from the prison authorities in return for his assistance in the investigation. He was transferred to a different prison the day of defendant's arrest. Grunt had no personal negative feelings toward defendant.

Defendant did talk to Grunt about his interest in a machine gun. Defendant wondered whether Bones could provide him with one. Defendant also mentioned the burglary of the physician's office, but Grunt had vague recollections of this. He did remember that defendant wanted to trade information for a machine gun. Grunt never spoke with Coombs or Taylor during the investigation.

On cross-examination it was established that Grunt had numerous convictions and had been sentenced to prison numerous times. Prior to defendant's meeting with Bones, Grunt advised defendant not to carry a weapon and that Bones would not rob him. Grunt might have said that Bones would not rob defendant because defendant was connected with Grunt. Defendant assured Grunt that he had been involved in drug deals before with his brother and could handle himself on the street. Grunt never told the prison authorities that defendant had smuggled marijuana in to him. Grunt was transferred to a different prison because his life was in danger.

After admitting into evidence its exhibits, the State rested.

The defense called Lynn D'Angelo, defendant's wife. They had been married since 1978 after having known each other for approximately three years. They have three children together ranging in

age from nine years to five years. Lynn was a nurse. Prior to beginning his employment at Menard, defendant was a principal and teacher at Covenant Christian School in Carbondale. In July 1985, defendant became employed at Menard. His salary was more than doubled and he received additional benefits such as insurance. Lynn had never been aware that defendant used any kinds of drugs. She was aware that defendant may have purchased one gun from his brother. She described her husband as a "gun nut." Defendant first became interested in guns in 1986, after he began working at Menard. Lynn did not think defendant had any suspicious friends or acquaintances. She said that when defendant first began working at the prison he was very idealistic and enthusiastic. Over time his enthusiasm for the job changed significantly. Defendant became very frustrated at Menard. He was unable to get teaching materials he needed. In 1987, defendant overheard an inmate being murdered by other inmates after two gangs were put in the commissary together. One of the gangs had been searched for weapons, and the other had not. Defendant was very upset. He began writing letters to the prison administration and the Department of Corrections. In 1987 the D'Angelos began having their mail stolen from their mailbox and their home was burglarized and robbed. Lynn walked in on the burglars, who ran out the back without being seen. There was a glass of wine on the table as if they had been drinking wine. The videocassette recorder was disconnected and on the floor, and the television was on the floor. Three guns were stolen. Lynn did not know that defendant later recovered the guns. Lynn began working for Dr. Bennett in fall of 1986. She was not aware that defendant had any negative feelings toward Dr. Bennett.

On cross-examination, Lynn stated that she at one time thought defendant had a death threat against him because he was acting very frightened and told her not to let the children out of her sight and keep the windows locked. She did not know that defendant had taken her key to Dr. Bennett's office. She innocently told him the code to the burglar alarm and how it worked. Lynn did not know about defendant selling guns until after his arrest.

Defendant testified on his own behalf. He described himself as a "gun nut." He was working on his doctorate degree in higher education, education administration. In 1980 he began working at Covenant Christian School in Carbondale as principal and teacher. The school was an elementary school. In July 1985, defendant began work as a teacher at Menard. In August 1987, defendant's home was burglarized and the first guns which defendant sold to Coombs

were taken. Defendant found out through contacts at the prison who had stolen the guns and retrieved them. One of the guns had the serial number ground off. Defendant did not tell the insurance company that he had recovered the guns, nor did he tell his wife. At around the same time, defendant's car was vandalized and mail was stolen from his mailbox. Defendant had only been arrested once in his life, when he was 16 or 17 years of age. Defendant did plead guilty to selling guns to a Missouri resident, Bones, while he resided in Illinois, a felony. After defendant got the stolen guns back, he decided to sell them. He talked to guards at Menard, thinking he might be able to sell the guns to someone there. He had previously sold a gun legally to a co-worker there. Quite a few of the people working at Menard were very interested in guns. Defendant received Bones' phone number from Grunt after Grunt had mentioned bringing the guns into the prison and defendant had declined. Defendant has never taken any weapons into the prison. Defendant had to go through the same security measures as any other employee entering the prison. When Grunt first told defendant about Bones, he described Bones as his old friend from Pana, a biker. Grunt told defendant that he had to give Bones the impression that defendant was well connected, had been around and was not a wimp. Defendant did not consider himself to be well connected. Defendant and Grunt discussed smuggling. It was thought that it would help defendant with Bones if it looked like he knew what he was doing and would protect defendant against Bones hitting him over the head and taking the guns. Defendant wanted to give Bones the impression that he would work with Bones and Grunt. Defendant never smuggled any drugs into the penitentiary. He never took any marijuana into the prison to Grunt. Contrary to what he had told Bones, defendant never smuggled knives or shanks into the prison. Defendant testified that he was wary of doing any favors for prisoners because they could then use that against him with the administration by trading information for favors such as privileges.

After defendant's first meeting with Coombs on April 22, 1988, defendant did not intend to have anything more to do with Coombs; however, Coombs contacted him. Defendant had previously talked with Grunt about his desire for a machine gun, and the very first time defendant talked with Grunt, Grunt mentioned that Bones had access to an MP5. A day or two before Coombs' May 6 phone call to defendant, Grunt approached defendant and told him to call Bones. Grunt told defendant that he had talked with Bones and

Bones told him that he had a fully automatic weapon for defendant. Defendant was interested in the gun. Defendant had no connections to buy cocaine. He has never used cocaine. In 1972, as a teenager, defendant experimented with drugs such as marijuana and Dilaudid. When defendant asked Bones to get him some Dilaudid, it was part of the act he was presenting. When Bones asked defendant to trade cocaine for a machine gun, defendant told him no, that he could not get cocaine. Defendant used his brother as an excuse to make it look like he was hooked up with something bigger and to try to stall Bones. Defendant's brother was not really involved in any criminal activity. Defendant hoped that by telling Bones that his brother would be gone for extended periods of time, Bones' interest in him would peter out. All of the guns which defendant sold to Bones were owned legally by defendant. Defendant testified that he and Grunt had discussed how defendant could acquire the MP5 when he could not get any cocaine or sufficient cash. Grunt knew that defendant's wife worked at a doctor's office and suggested that defendant's wife steal the money. They finally came to the conclusion that defendant could trade information about the doctor's office for the MP5. When Bones suggested that defendant bring cocaine into the prison, defendant did not want to but felt that he had to play along. Defendant wanted the machine gun and he just played along. Defendant had no intention of going through with it. Defendant had intended to tell Bones "no" when they met on June 2, but things got out of hand. He thought Agent Taylor, posing as "Patti," was acting high and strange. Defendant was scared. Defendant decided to take the cocaine and just give it back when he got the machine gun. Defendant did not intend to keep either the cocaine or the $200. Defendant testified that it always seemed that Grunt knew what was going on before defendant did. Bones also seemed to know what defendant and Grunt had talked about.

Defendant testified about an incident in which an inmate was killed. Two rival gangs had been let into the yard at the same time. One gang was searched for weapons and the other was not. Defendant witnessed this. He felt angry, betrayed and frustrated and began voicing objections to the administration about the way the prison was run. He sent letters to the prison warden and the Director of the Department of Corrections.

On cross-examination, defendant testified that he reported the stolen guns to his insurance company and received a check. He did not return the money when he recovered the guns and did not re-

port to his insurance company that he had recovered the guns until after he was sued by the company.

David Pauley, also known as Grunt, was called by the State to testify in rebuttal. He testified that he never gave defendant any reason to believe that Bones was dangerous or might hurt defendant. Grunt did not tell defendant to pretend he was in the smuggling business, and defendant raised the subject of the machine gun first, not Grunt. Defendant also first suggested that he bring marijuana into the prison.

The parties stipulated that, if called to testify in rebuttal, Agent Coombs would testify that he never did anything to intimidate defendant or make defendant believe that Bones was a dangerous person. Coombs would also testify that during the meeting of June 2, 1988, Agent Taylor did not act high or drugged in any way.

After hearing closing argument and reviewing its notes, the court found the defendant guilty on all three counts. The court did not believe that the defendant had established the defense of entrapment.

On November 14, 1990, defendant was sentenced on count III, solicitation to commit burglary, to a term of imprisonment of three years and a fine of $1,000 and on count I, unlawful possession with intent to deliver a controlled substance, to six years' imprisonment. Defendant appeals, raising two arguments: (1) that the State failed to prove beyond a reasonable doubt that defendant was not entrapped; and (2) that the sentence of six years' imprisonment on count I, a nonviolent offense, is unconstitutional under the eighth amendment to the United States Constitution as cruel and unusual punishment and under article I, section 11, of the Illinois Constitution of 1970.

Illinois provides for a statutory defense of entrapment in section 7—12 of the Criminal Code of 1961 as follows:

> "A person is not guilty of an offense if his conduct is incited or induced by a public officer or employee, or agent of either, for the purpose of obtaining evidence for the prosecution of such person. However, this Section is inapplicable if a public officer or employee, or agent of either, merely affords to such person the opportunity or facility for committing an offense in furtherance of a criminal purpose which such person has originated." (Ill. Rev. Stat. 1987, ch. 38, par. 7—12.)

The defense is an affirmative defense, and once defendant presents some evidence to raise the issue of entrapment, the State bears the burden of proving beyond a reasonable doubt that defendant was

not entrapped, together with all other elements of the offense. *People v. Dollen* (1972), 53 Ill. 2d 280, 283-84, 290 N.E.2d 879, 881; *People v. Tipton* (1980), 78 Ill. 2d 477, 487, 401 N.E.2d 528, 532-33.

Relying on a short line of cases beginning with *People v. Carpentier* (1974), 20 Ill. App. 3d 1024, 1027, 314 N.E.2d 647, 649, defendant argues that the State also bears the burden of proof on defendant's appeal from his conviction and that, therefore, in appellate review of the entrapment defense, the court is to determine all testimony of the defendant in the light most favorable to him. However, as this court pointed out in *People v. Poulos* (1990), 196 Ill. App. 3d 653, 657, 554 N.E.2d 448, 451, *Carpentier* dealt with the question of whether defendant was entitled to have the jury instructed on the defense of entrapment. The court held that in deciding this issue, all of the testimony of defendant in support of his entrapment defense must be viewed in the light most favorable to the defendant. *Carpentier* did not hold, however, that in deciding whether the State has sustained its burden of proof, the defendant's testimony must be viewed in the light most favorable to defendant. However, cases following *Carpentier* apparently picked up on the language in *Carpentier* and misstated the standard of review of the entrapment defense. *People v. Husted* (1981), 97 Ill. App. 3d 160, 171, 422 N.E.2d 962, 970; *People v. Connor* (1988), 176 Ill. App. 3d 900, 905, 531 N.E.2d 966, 969; see *Poulos*, 196 Ill. App.3d at 657-58, 554 N.E.2d at 451.

Our supreme court has stated that, in reviewing the sufficiency of the evidence to support a conviction, *"all of the evidence* is to be considered in the light most favorable to the prosecution." (Emphasis in original.) (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277.) Thus, in determining whether the State has sustained its burden of proof with respect to the entrapment defense, *all* of the evidence must be viewed in the light most favorable to the prosecution. A trial court's finding that defendant was not entrapped will not be disturbed on appeal unless the reviewing court concludes that entrapment exists as a matter of law. (*People v. Tipton* (1980), 78 Ill. 2d 477, 487, 401 N.E.2d 528, 533.) We must determine, then, whether in the instant case it can be said that defendant was entrapped as a matter of law, viewing all of the evidence in the light most favorable to the State.

Whether the affirmative defense of entrapment was established as a matter of law depends on if (1) the government initiated the crime and induced the defendant to commit it and (2) the defendant

had no predisposition to commit the offense. (*People v. Schillaci* (1988), 171 Ill. App. 3d 510, 517, 526 N.E.2d 871, 875.)

> "[W]here it appears that officers of the law or their agents have conceived and planned a criminal offense and have incited, induced, instigated or lured the accused into committing an offense which he would not otherwise have committed and had no intention of committing, entrapment is established and no conviction may be had. [Citations.] On the other hand, entrapment is not available as a defense to one who has the intent to commit the crime and does so merely because an officer of the law, for the purpose of securing evidence, affords such person the opportunity to commit a criminal act, or purposely aids and encourages him in its perpetration." (*People v. Dollen* (1972), 53 Ill. 2d 280, 283-84, 290 N.E.2d 879, 881.)

Once the defendant has demonstrated that the State induced him to commit a criminal act, then the burden is on the State to prove the defendant was ready and willing to commit the crime without persuasion, that is, that he had a predisposition to commit the crime. *People v. Boalbey* (1986), 143 Ill. App. 3d 362, 364-65, 493 N.E.2d 369, 371.

Because the defense does not apply if the defendant was predisposed to commit the crime (*People v. Husted* (1981), 97 Ill. App. 3d 160, 169, 422 N.E.2d 962, 969), the critical inquiry is whether the criminal purpose originated with the defendant. (*Poulos*, 196 Ill. App. 3d at 658, 554 N.E.2d at 451.)

> "In Illinois, entrapment occurs when the criminal design originates with the State and it implants the disposition to commit an offense in an innocent person's mind and that person is incited or induced by a public officer or his agent for the purpose of obtaining evidence for prosecution of such person." (*People v. Connor* (1988), 176 Ill. App. 3d 900, 905, 531 N.E.2d 966, 969.)

For entrapment to exist, the idea of committing the offense must originate not with the suspect but rather with the enforcement authorities. (*People v. Fisher* (1979), 74 Ill. App. 3d 330, 333-34, 392 N.E.2d 975, 978.) Entrapment as a matter of law is not established where there is any substantial evidence from which it may be inferred that the criminal intent to commit a particular offense originated in the mind of the accused. (*People v. Myers* (1980), 92 Ill. App. 3d 229, 234, 415 N.E.2d 1108, 1112.) Generally, predisposition is established by a defendant's willingness to participate in criminal

activity before his initial exposure to government agents, and the determination of predisposition to commit crime rests upon the facts of the case. *Poulos*, 196 Ill. App. 3d at 661, 554 N.E.2d at 453.

In narcotics cases, the factors the courts have considered when making a determination as to predisposition include the defendant's initial reluctance or his ready willingness to commit the crime, the defendant's familiarity with drugs and his willingness to accommodate the needs of drug users, the defendant's willingness to make a profit from the illegal act, the defendant's prior or current use of illegal drugs, and the defendant's participation in testing or cutting the drugs. (*Poulos*, 196 Ill. App. 3d at 661, 554 N.E.2d at 453.) Moreover, the trial court should consider whether the defendant engaged in a course of conduct involving similar offenses and whether the defendant had ready access to a drug supply. (*Poulos*, 196 Ill. App. 3d at 661, 554 N.E.2d at 453.) The fact that defendant has no prior criminal record is a factor to be considered but is not sufficient standing alone to show that the defendant was entrapped. *People v. Andreano* (1978), 64 Ill. App. 3d 551, 557, 381 N.E.2d 783, 788.

As stated in *People v. McSmith* (1961), 23 Ill. 2d 87, 178 N.E.2d 641, the issue in an entrapment defense is whether the State induced an otherwise innocent person to commit a criminal act, or whether defendant was already predisposed to commit the act and exhibited only the natural hesitancy and caution of one acquainted with and engaged in illegal activity. The court in *McSmith* found that

> "[t]he circumstances in the record reflect, rather, a familiarity with and a place in the area of criminality involved, and an intent on defendant's part to commit the crime when opportunity afforded, once he had assured himself it was profitable and safe. Under such circumstances, the defense of entrapment will not lie." 23 Ill. 2d at 95, 178 N.E.2d at 645.

We think, as did the trial court, that defendant presented sufficient evidence that the State induced him to commit the crime to shift the burden to the State to prove that defendant was predisposed to commit the crime. We also think, as did the trial court, that the State sustained this burden beyond a reasonable doubt.

On appeal, defendant argues that this case is a narcotics-dealing case and should be examined by us as a narcotics case. Thus, defendant argues, the various factors which courts have considered in determining predisposition in narcotics cases should also be con-

sidered by us in determining defendant's predisposition. For example, defendant argues that his lack of familiarity with the narcotics business, his lack of ready access to narcotics and the fact that the State supplied the narcotics to defendant all indicate that defendant was not predisposed to commit a narcotics-related offense.

■ We disagree with defendant that this case is a narcotics-dealing case. While it is true that defendant was charged with unlawful possession with intent to deliver cocaine, we think the real gist of the offense was the smuggling of contraband into a State correctional facility. Thus, we will address the issue of defendant's predisposition to commit such an offense. We note, however, that many of the factors which courts have considered in determining predisposition in narcotics-dealing cases may also be helpful in determining predisposition to commit other types of offenses.

We begin with what has been called the critical inquiry in the examination of any entrapment defense, whether the criminal design or intent originated with the defendant or with the State. It appears from the record that defendant originated the idea of smuggling the handguns into the prison. It also appears that defendant first suggested the idea of smuggling other contraband into the prison in his initial telephone conversation with Agent Coombs on April 18, 1988. At the meeting between defendant, Coombs and Taylor on April 22, 1988, defendant again first raised the subject of smuggling drugs into the prison and encouraged Coombs and Taylor to consider it. During that meeting, defendant repeatedly raised the idea of smuggling drugs into the prison to Grunt. Again, in the phone conversation between defendant and Coombs of May 6, 1988, defendant raised the idea of smuggling drugs into the prison. In the phone conversation of May 23, 1988, defendant again asked Coombs if he was interested in providing defendant with contraband to smuggle into the prison. While defendant testified that he was told by Grunt to ask Coombs about smuggling drugs into Menard, Grunt denied that he raised this subject with defendant. Grunt testified that defendant first suggested to him that defendant attempt to smuggle marijuana in to Grunt. We must accept Grunt's testimony as true as we must view all of the evidence in the light most favorable to the State. Thus, the criminal design or intent to smuggle contraband into Menard originated in the mind of defendant, not in the minds of the State's agents. Indeed, Coombs testified that he was surprised when defendant suggested the smuggling. This is not a case of an individ-

ual with an innocent mind into which is implanted by the State the disposition to commit the crime.

We think there is substantial evidence from which it can be inferred that the criminal intent to smuggle drugs into Menard originated in the mind of the defendant. That defendant was interested in smuggling handguns into the prison prior to his initial exposure to government agents also serves to establish defendant's predisposition.

■ Defendant argues that various factors weigh in favor of defendant's lack of predisposition. He first argues that the fact that the State supplied the drugs has traditionally been a factor weighing against a finding of predisposition. Our examination of the cases which address this factor (*People v. Strong* (1961), 21 Ill. 2d 320, 172 N.E.2d 765; *People v. Dollen* (1972), 53 Ill. 2d 280, 290 N.E.2d 879; *People v. Cross* (1979), 77 Ill. 2d 396, 396 N.E.2d 812) indicates that the critical inquiry remains whether the criminal purpose of selling the drugs originated with the defendant, regardless of who supplied the drugs. (*Cross*, 77 Ill. 2d at 404, 396 N.E.2d at 815-16.) If, by supplying an individual with controlled substances, the government is merely facilitating or providing the opportunity for the individual to make an unlawful delivery, entrapment does not exist. (*Cross*, 77 Ill. 2d at 404, 396 N.E.2d at 816.) In the instant case, we have already pointed out that the criminal purpose of obtaining the drugs in order to smuggle them into Menard originated with defendant. It was only because defendant had no other source of illegal drugs that he sought to obtain them from the government agents. By supplying those drugs, the government merely provided defendant with the opportunity to commit a crime to which he was already predisposed.

The second factor which defendant argues weighs against a finding of predisposition is his initial reluctance or lack of readiness to commit the crime. Defendant argues that, after his initial telephone call to Bones, he never called Bones again. Instead, Bones called defendant to pursue criminal activity. However, defendant did contact Bones initially and, when Bones called, defendant was never reluctant to talk or meet with Bones. Furthermore, in each conversation, defendant raised the subject of smuggling drugs into Menard. Defendant was always present to answer the telephone when Bones had arranged to telephone him.

Defendant also argues that on June 2, 1988, when Taylor delivered the drugs to defendant, defendant was reluctant to accept them. The record does not support his assertion. Defendant ex-

pressed surprise that Taylor had brought the drugs to that meeting and expressed fear of getting caught with them. However, he readily agreed to accept them and told Taylor, "you just tell me what you want to do." Defendant merely demonstrated the natural hesitancy and caution of one acquainted with and engaged in illegal activity.

The third factor on which defendant relies is his lack of familiarity with drugs. While defendant did not show great knowledge of drugs or the illegal drug trade, he did show great and detailed knowledge of how to smuggle contraband into the prison. He indicated to Coombs that he had on previous occasions smuggled shivs or homemade knives into the prison. Grunt also testified that defendant had smuggled marijuana into the prison. Defendant did not show any lack of familiarity with the offense he sought to commit.

The fourth factor is whether defendant readily acceded to the crime. The record shows that, not only did defendant readily accede to the crime, he originated it.

The fifth factor which defendant argues weighs in his favor is his lack of a ready source from which to obtain drugs. Defendant argues that he was obviously not a drug dealer. While it is true that the record does not indicate that defendant had any connections in the illegal drug trade prior to his contact with Agent Coombs, defendant sought out Coombs as a source of drugs to smuggle into Menard. That defendant had no ready source of illegal drugs does not demonstrate that he was not predisposed to smuggle contraband into the prison.

Defendant argues that the sixth factor in his favor is that the government suggested the criminal activity. This is simply not supported by the record, which shows that defendant initially raised the subject of smuggling drugs into prison.

The seventh factor is whether the government initiated the conversations. Defendant argues that all conversations concerning the smuggling of drugs into the prison were initiated by Coombs' telephone calls to defendant. It is true that, after defendant's initial call to Coombs, Coombs initiated all other telephone calls. However, defendant did initiate the contact with Coombs on April 18, 1988, and did raise initially the subject of smuggling drugs into Menard. This factor does not weigh in defendant's favor.

The next factor is whether defendant had been engaged in a course of conduct involving similar offenses. Defendant argues that he had no prior criminal record, did not have a reputation as a drug

user, and was not familiar with drugs or drug paraphernalia. At the beginning of the investigation, the State had no information connecting defendant with drugs. While this is true, the State did have information that defendant was interested in smuggling contraband into the prison. Furthermore, defendant told Coombs that he had previously smuggled homemade knives into the prison. Grunt testified that defendant had smuggled marijuana into the prison. Furthermore, defendant demonstrated great knowledge about how to smuggle contraband into the prison. Again, this factor does not weigh in defendant's favor.

Defendant next argues that his reasonable fear of Bones is an important criterion in determining predisposition. He argues that an effective portrayal that the agent is potentially violent coupled with prior, reasonable concerns about one's safety can explain how an innocent person can be entrapped. He relies upon *People v. Fisher* (1979), 74 Ill. App. 3d 330, 392 N.E.2d 975, in which the court found that the defendant's

> "overwhelming desire to 'get rid' of [the agent] and to have him stop bothering her compelled [defendant] to commit the offense. This desire was no doubt intensified by the memory of the recent battery by another upon her in combination with [the agent's] highly effective portrayal of a 'speed freak' heavily dependent upon amphetamines. ([Defendant] testified that [the agent] 'acted as if he needed some speed real bad, and he hit the side of bar and said that if he didn't get any he was going to, you know.' " (74 Ill. App. 3d at 335, 392 N.E.2d at 979.)

In *Fisher*, the government agent actually threatened the defendant if she was unable to supply him with drugs. The defendant's fear was therefore clearly reasonable. Furthermore, other evidence in *Fisher* indicated that the defendant was not predisposed to commit the crime. In the instant case, however, although defendant testified that he was afraid of "bikers," including Bones, both Grunt and Coombs testified that they did nothing to create any such fear in defendant. The record does not indicate any actions or words on the part of Bones which would have caused defendant to fear him. Finally, although the record indicates that defendant was afraid of being caught in illegal activity, it does not reveal any evidence, other than defendant's own testimony, that defendant actually did fear Bones or Patti. In any event, in light of the other evidence of defendant's predisposition, this factor does not establish defendant's lack of predisposition.

The tenth factor upon which defendant relies is that when Coombs first offered to buy drugs from defendant in exchange for a machine gun, defendant refused. Defendant argues that this shows that he was not predisposed to deal in drugs. However, all this shows is that defendant had no access to drugs. It does not demonstrate that defendant was not predisposed to smuggle contraband into Menard.

The final factor upon which defendant relies is that defendant only committed the offense in order to "get rid" of Coombs, again relying on *Fisher*. Defendant testified at trial that he accepted the drugs from Agent Taylor with the intention to return them when he received the machine gun. Apparently the trial court did not believe defendant's testimony in this regard. We must accept the fact finder's determination with respect to the credibility of the witnesses. *Collins*, 106 Ill. 2d at 261-62, 478 N.E.2d at 277.

The record in the instant case reveals that the government agents merely provided defendant with an opportunity to commit a crime to which he was already predisposed. The State sustained its burden of proving beyond a reasonable doubt that defendant was not entrapped.

Defendant also mentions in his brief on appeal that "[t]his Court should therefore consider whether 'the conduct of [the] law enforcement agents is so outrageous that due process principles *** absolutely bar the government from invoking judicial process to obtain a conviction,' " quoting *United States v. Russell* (1973), 411 U.S. 423, 431-32, 36 L. Ed. 2d 366, 373, 93 S. Ct. 1637, 1643. *Russell* did recognize that there may be situations in which government conduct is so outrageous that it violates that " 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment." (411 U.S. at 432, 36 L. Ed. 2d at 373, 93 S. Ct. at 1643, quoting *Kinsella v. United States ex rel. Singleton* (1960), 361 U.S. 234, 246, 4 L. Ed. 2d 268, 276, 80 S. Ct. 297, 304.) Defendant cites to, and we are aware of, no Illinois cases in which a prosecution was barred because of outrageous governmental conduct. However, some Illinois courts have addressed this "defense" but found no outrageous governmental conduct under the facts of the case. (See *People v. Johnson* (1984), 123 Ill. App. 3d 363, 462 N.E.2d 948.) It has been held, however, that this defense is waived if not raised in a post-trial motion. *People v. Norks* (1985), 137 Ill. App. 3d 1078, 1086, 484 N.E.2d 1261, 1267.

■ Defendant failed to raise this issue before the trial court in his post-trial motion. Accordingly, it is waived. In any event, we do not believe that the conduct of the government agents in this case is so outrageous that it violates fundamental fairness or shocks the conscience. (See also *People v. Lawrence* (1991), 208 Ill. App. 3d 292, 566 N.E.2d 878.) The prosecution did not violate defendant's right to due process under the fifth amendment to the United States Constitution.

Defendant's final argument on appeal is that his sentence of six years' imprisonment for a nonviolent offense is unconstitutional under the eighth amendment to the United States Constitution as cruel and unusual punishment and under article I, section 11, of the Illinois Constitution of 1970. Defendant was convicted of violating section 401 of the Illinois Controlled Substances Act. (Ill. Rev. Stat. 1987, ch. 56½, par. 1401.) That section provides that violation constitutes a Class X felony and provides a penalty of not less than six years' and not more than 30 years' imprisonment for possession with intent to deliver 15 grams or more of a substance containing cocaine. Probation is not an option, and the minimum sentence of imprisonment is mandatory.

Defendant argues that a minimum sentence of imprisonment for a nonviolent and, as he describes it, "not truly serious" offense by an individual with no previous criminal record constitutes cruel and unusual punishment within the meaning of the eighth amendment to the United States Constitution. He also argues that the sentence violates article 1, section 11, of the Illinois Constitution of 1970, which requires "proportionate penalties," because his offense was not severe, he has a strong prospect of rehabilitation, is educated, has no prior record of criminal activities and displayed no prior criminal tendencies. He argues that a mandatory sentence of imprisonment disregards the constitutional mandate that all sentences be determined according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. Defendant asks us to reduce or reverse his sentence.

■ Similar challenges have been made to mandatory prison sentences under other provisions of our criminal laws. (See *People v. Castro* (1987), 151 Ill. App. 3d 664, 667, 503 N.E.2d 376, 378; *People v. James* (1976), 38 Ill. App. 3d 594, 597, 348 N.E.2d 295, 298.) None have been successful. In *Castro*, this court upheld the mandatory minimum sentence of six years' imprisonment under section 401 of the Illinois Controlled Substances Act for delivery of more than 15 grams of a substance containing heroin against a

challenge that it violated the Illinois Constitution. In *James*, this court upheld the mandatory prison sentence under section 401 of the Illinois Controlled Substances Act for the offense of unlawful delivery of a substance containing lysergic acid diethylamide (LSD) against challenges that it violated both the Illinois and Federal constitutions. Finally, we find that in sentencing defendant to the minimum mandatory sentence, the court did take into consideration such mitigating factors as defendant's rehabilitative potential, his education and his lack of a previous criminal record.

■■ A final point, not mentioned by either party, comes to our attention from the record on appeal. There appears to be a discrepancy between the oral pronouncement of conviction and sentence and the written judgment order entered thereon.

On November 14, 1990, the trial court pronounced sentence in open court. Defendant was sentenced to a term of imprisonment of three years and a fine of $1,000 on count III, solicitation (burglary). With respect to count I, unlawful possession with intent to deliver, and count II, unlawful possession, the court stated:

> "As to the other two charges, I don't believe that the convictions on the, both the charge of possession of cocaine in Count II and possession with intent to deliver in Count I can both stand since they are both based on the same conduct, but as I expect there will be an appeal, and it's conceivable that the conviction on the more serious offense might be reversed, I am going to go ahead and indicate what my sentence would be as to each count in the event the conviction should be reversed as to Count I but upheld as to Count II. *** I think if I had Count II without Count I, I would sentence you to four years' probation and fine you an amount equal to the street value of the drugs involved. *** [M]y sentence on that charge then would be four years [*sic*] probation. *** It's my duty, of course, to sentence you on Count I, then, to a sentence of six years in the Department of Corrections, which I hereby do. *** All right, then judgments of conviction will be entered on the verdicts."

All sentences were to be served concurrently.

The written judgment order, filed November 16, 1990, states that the crimes for which defendant is being adjudged guilty are unlawful delivery of controlled substance (count I) and solicitation (burglary) (count III). The sentence recited by the written judgment is as follows:

"Six (6) years for Unlawful Delivery of Controlled Substance (Count I) concurrently with three (3) years for Solicitation (Burglary) (Count III) and concurrently with four (4) years [*sic*] probation for Unlawful Possession of Controlled Substance (Count II). All counts are to run concurrently with each other."

A judgment of conviction and sentence of probation was also filed November 16, 1990, on count II, indicating that judgment was being entered on that count and that defendant was being sentenced to a term of probation of four years.

Thus, the oral pronouncement of conviction indicates that the court finds defendant guilty on count I of unlawful possession with intent to deliver while the written judgment order describes the offense as unlawful delivery. Furthermore, the oral pronouncement indicates that no judgment will be entered on count II because it is an included offense of count I, but the written judgment order does impose sentence on count II.

Although the written judgment order is in error, the error is easily cured and does not require reversal or remand of this cause. In determining the sufficiency of a judgment of conviction, the entire record must be searched and all parts of the record interpreted together. A deficiency in one place may be cured by what appears in another. (*People v. McGowan* (1953), 415 Ill. 375, 383-84, 114 N.E.2d 407, 411.) Furthermore, in a criminal case the pronouncement of sentence is the judicial act which comprises the judgment of the court. The entry of the judgment order is a ministerial act and is merely evidence of the sentence. (*People v. Williams* (1983), 97 Ill. 2d 252, 310, 454 N.E.2d 220, 248.) The written judgment order entered must coincide with the judgment pronounced by the court. *People v. Sanders* (1977), 47 Ill. App. 3d 180, 184, 361 N.E.2d 884, 887.

In accordance with the powers granted us by Supreme Court Rule 615(b) (134 Ill. 2d R. 615(b)), we hereby modify the written judgment order of the court, entered November 16, 1990, to bring it into conformity with the oral pronouncement of the court. The written judgment order is hereby modified with respect to count I to describe the offense as unlawful possession with intent to deliver more than 15 grams of cocaine. The judgment and sentence with respect to count II, unlawful possession of more than 15 grams of cocaine, is hereby vacated. In all other respects the judgment of the court is affirmed.

For the foregoing reasons, the written judgment order of the circuit court of Williamson County is modified in part, vacated in part and affirmed in part.

Modified in part, vacated in part, and affirmed in part.

HARRISON and LEWIS, JJ., concur.